266 N.J. Super. 169 (1993)
628 A.2d 1080
TITO DELGOZZO[1], CLAUDIA CAPRITTI, ROBERT SLIMM, CHARLES HECK AND WENDY HECK, PLAINTIFFS-APPELLANTS,
v.
WILLIAM KENNY, JR., STANLEY R. ORCZYK, PAUL A. VERMYLEN, JR., MEENAN OIL CO., INC., BLUERAY SYSTEMS, INC., AND KOV CORP., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 1993.
Supplemental Briefs filed June 9, 1993.
Decided July 20, 1993.
*172 Before Judges ANTELL, DREIER and SKILLMAN.
Sherrie R. Savett, admitted pro hac vice, argued the cause for appellants (Peter L. Masnik, attorney; Ms. Savett, Paul R. Rosen, Karen S. Orman and Robert L. Grundlock, Jr., on the brief).
Bruce W. Ficken, admitted pro hac vice, argued the cause for respondents (Green, Lundgren & Ryan, attorneys; Peter P. Green, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs appeal by leave granted from an order denying class certification. Following the disposition of a parallel federal action on jurisdictional grounds,[2] plaintiffs reactivated the present action, *173 filed in 1988, seeking "a substantive determination of their remaining strict liability, negligence, breach of warranty, intentional tort, and fraud counts." On June 1, 1992, plaintiffs filed a Notice of Motion for Class Certification. We granted leave to appeal from the denial of this motion. Following oral argument, we requested supplemental briefs from counsel on the effect of D'Angelo v. Miller Yacht Sales, 261 N.J. Super. 683, 619 A.2d 689 (App.Div. 1993), on this case.
The named plaintiffs in this case were all residents of New Jersey who purchased "blue flame" oil furnaces or boilers from defendant Blueray Systems, Inc. ("Blueray") for residential use in New Jersey. They seek class certification for a class "comprised of thousands of persons and entities throughout New Jersey, New York, Connecticut and the United States." In all, "during the Class Period, defendants shipped approximately 21,000 Blueray (blue flame) furnaces and 14,000 Blueray "blue flame" boilers throughout the United States and Canada."[3]
Defendant Meenan Oil Co., Inc. is a Delaware Corporation with its principal place of business in the State of New York. Meenan allegedly does "a significant amount of its business in Camden County and throughout New Jersey." Defendant KOV Corporation is allegedly the successor corporation to Meenan.[4] Defendant Blueray is a wholly owned subsidiary of Meenan, with its principal place of business in Pennsylvania. Blueray allegedly manufactured *174 Blueray "blue flame" furnaces and boilers throughout the class period of 1974 to 1983. Defendant William F. Kenny, Jr., was Meenan's chairman of the Board and CEO throughout the class period. He is allegedly a principal of KOV. Defendants Stanley R. Orczyk and Paul A. Vermylen, Jr. were both vice presidents of Meenan during all or part of the class period, and both were principals of KOV at the time the second amended complaint was filed on August 1, 1988.
Plaintiffs allege that defendants, anxious to capitalize on consumers' growing concern with fuel conservation and environmental issues, marketed the "blue flame" systems "as the state of the art residential heating system," representing technological advances over the traditional "yellow flame" units.[5] Blueray advertised the units as being cleaner, more efficient, and more economical than either traditional oil furnaces and boilers or gas units. Such advertising allegedly induced consumers to purchase the "blue flame" units. "Blue flame" units cost approximately $2,000. Notwithstanding the fact that Blueray manufactured various models and made several design changes throughout the class period, plaintiffs allege that the manufacturing defects causing the problems of which they complain were common to all models throughout the class period and were not corrected by any of the alleged "enhancements."
Plaintiffs contend that all the Blueray products contained a common design defect that caused the production and emission of excessive levels of carbon monoxide, and caused the units to malfunction, pulsate, and emit soot. Moreover, the units also allegedly required more servicing than conventional units. Plaintiffs assert that defendants were aware of the problems and hazards associated with the Blueray units, yet continued to advertise and market the units without disclosing to potential purchasers their "inherent defect, or hazardous and unreasonably dangerous *175 condition." As further proof of the hazards associated with Blueray "blue flame" units, plaintiffs cited a December 1987 Consumer Product Safety Alert, issued by the U.S. Consumer Product Safety Commission, warning of their "potential" for carbon monoxide poisoning, and advising that, since 1979, seven deaths from carbon monoxide poisonings had been linked to "improper maintenance or servicing" of the "blue flame" units. Defendants ceased manufacturing and marketing the "blue flame" units in 1983.
In support of their motion for class certification, plaintiffs submitted portions of depositions of themselves and others. For example, Jay L. Dugan, former Meenan General Manager, tended to confirm Meenan's market strategy for the "blue flame" products, and also acknowledged that the "blue flame" units required more servicing than the conventional "yellow flame" heaters. He also acknowledged other difficulties associated with the units that seemed not to comport with the advertising. Bradley Davis, another former Meenan General Manager, noted that the initial "blue flame" units were not "life-cycle tested, because that was something that was not part of the capabilities of the firm at that time," and that Blueray was "anxious to get the product out there and get it sold." He noted that the initial units pulsated and were difficult to maintain. He attributed the problem to the marriage of two incompatible technologies, essentially the "blue flame" combustion system encased in standard "yellow flame" casings. In Davis's opinion, Blueray's advertising did not accurately reflect the actual "blue flame" unit functioning. He also represented that Blueray, through defendant Kenny, was aware of this. In addition, Davis noted that Blueray was getting complaints from builders who were utilizing the products and that "this was affecting our sales effort."
Plaintiffs also presented the affidavit of Morton H. Lerner, a private engineering consultant who "reviewed various documents pertaining to the Blueray Systems, Inc. `blue flame' heating units ... and ... inspected a Blueray heater" in formulating his *176 opinion. According to Lerner, the "blue flame" units installed in residences consist of standard yellow flame casings housing "blue flame" burner systems, which are "technologically more delicate" than yellow flame burners. According to Lerner, the necessary settings needed for proper functioning of "blue flame" burners "cannot be consistently maintained" as designed, and appropriate redesign was never accomplished. These defects result in "small explosions (puff-backs), incomplete combustion and complete heater shutdown in the winter." Incomplete combustion may result in carbon monoxide production and emission, as well as "the production of excessive amounts of soot, odor, smoke, noise, and pulsation," which a properly designed system can keep within acceptable limits. Finally, Lerner observed that Blueray units failed to provide adequate instructions and warnings.
In their depositions, the prospective class representatives related various problems with their "blue flame" units, including shutdown, pulsation, noise, soot, and smoke. According to Charles Heck, the unit in his and his wife's home required 20 to 30 service calls (covered under their warranty) in October and November 1982. The Hecks subsequently had their unit converted at no charge, and have experienced no further problems of the sort associated with their "blue flame" unit. However, they have not replaced the Blueray unit with a more efficient one due, apparently, to a "lack of money to do it right at the time."
Plaintiffs Slimm and Capritti apparently had difficulties locating a qualified service person when their unit experienced shutdown, and they subsequently used a wood and coal burning stove for the remainder of the 1988 heating season. Slimm and Capritti eventually had their "blue flame" unit removed, after being told that it "could not be converted to a yellow flame." Capritti also became concerned about the safety of their unit after learning that a family in a nearby New Jersey community "had died because of a heater malfunction, [and] the heater involved was a Blueray."
In their complaint, plaintiffs seek relief on theories of negligence, strict liability, breach of warranties, and intentional tort. *177 In addition, they allege that they are entitled to punitive damages as a result of defendants' intentional or reckless malicious conduct. Although plaintiffs' complaint alleges physical harm suffered by some class members, they assert that their claims seek only economic damages and "never included a claim for personal injuries."
In essence, plaintiffs allege that defendants knew or should have known that they were placing a hazardous product into the stream of commerce, that purchasers relied on defendants' "false and misleading" advertising in purchasing the product, that defendants failed adequately to warn purchasers of the product's inherent hazards, and that defendants "fraudulently conceal[ed]" their conduct to the ultimate harm of the plaintiff class. The unifying themes underlying all theories of liability asserted by plaintiffs are claims of consumer fraud and products liability.
In denying class certification, the trial judge made "preliminary determinations," and then heard argument of plaintiffs' counsel, upon which he concluded that his "original decision stands." We reproduce here the material part of the trial judge's decision:
The Plaintiffs  oh, they deny they seek a recovery [for] any class member who suffered personal injury. On Page 3 of the original memorandum they say, and I quote, "The problems were severe and wide spread and in some instances personal injury and death resulted." Also personal injury is claimed in the amended complaint.
Now, the Plaintiffs, apparently in an effort to avoid dealing with any issue relating to personal injury, are willing to abandon such claim, even though according to their own allegations members of the class have suffered severe injury....
The Plaintiffs seek to simplify their matters when in fact it is far from simple. The Plaintiffs argue, all that has to be done is prove that the Blue Ray Heaters were defective and inherently dangerous. Whether Defendants knew or should have known the Blue Ray Heaters were defective and dangerous and whether Defendants breached implied warranties and whether Defendants misrepresented material facts. The Plaintiffs can't really mean that this is all that is in the case. It may be that these are some common issues stated in a very general broad brush fashion.
Throughout the memo the Plaintiffs speak of Blue Ray Heaters as if all heaters were the same. Yet it is alleged by competent legal evidence that they are not in the affidavit of Paul A. Vermilelin (phonetic spelling), Jr. Plaintiffs do not attempt to indicate which members of the class had problems, who did not.

*178 The class, according to Plaintiffs, is 35,000 people in 25 states. If the Plaintiffs knew of the 35,000 people they should make some effort to set forth with some degree of spec  of particularity who in the class was affected by the alleged conduct and who was not, who purchased the products and who were consumers  or who purchased which products....
The Plaintiffs distinguish Lee (sic) versus American Motors on the basis that ... in Lee (sic) there was evidence that the manufacturing during the class period substantially changed the features that made the CJ5P unsafe. They argue no such evidence in this present case. This is not so. Even Glessner acknowledges "the Blue Flame" models manufactured by Defendants were the subject of design enhancements during the class period....
It appears to the Court that the present Plaintiffs are not in a position to adequately represent the interest of the class, even assuming the class were proper for certification. The Plaintiffs owned units for many years, which negates the fact that they had any problems of a serious nature. Only Plaintiff Heck had problems starting early on. Defendants corrected the problem by converting the unit to yellow flame. Capriatti experienced shutdown on several occasions. This is a far cry from the allegations of the Plaintiff's counsel. [Delgozzo] experienced complete shutdown on the coldest night of the year.
It seems the Plaintiffs' claims are nowhere near as serious as the claims counsel allege exist. So they certainly would not be appropriate to represent the members of the thousands of defective Blue Ray Heaters in the hands of class members, "In many cases continuing to cause dangerous conditions of excessive carbon monoxide"....
Generally speaking, Plaintiffs' counsel describes the alleged class as 35,000 people.... The class is apparently composed of persons in 25 states and Canada. There are some common questions of ... law, no doubt about it and some common questions of fact. But, many, if not all of the questions of fact, must be addressed to each member of the class with particularity and specificity.
Such as, when was the unit purchased? Type of the unit. Most important, manner of installation, manner of service, who had problems, who did not, extent of problems, nature of damage, extent of same. As to questions of law, trying to deal with the law of perhaps only 5 different states is totally unacceptable. It may be that all 25 states do not have different laws but that is not the question. There will be many states who have substantial differences in their respective laws both statutorily and casewise.
The Court acknowledges some courts have not felt this is a valid consideration. This Court does not agree with that. Also whether the law, as it is determined to be raises substantial questions as to each member of the class and as to the facts supporting their legal conclusions to be reached. These problems make the issues as to each member or group most fact sensitive.
Finally, in the opinion of the Court, the class action is not a superior means to address the problems.... In fact, in the opinion of the Court, it is not an acceptable means at all. The magnitude of the class would make it unruly, and more importantly, each member would most likely receive far less than would be received if each member who was actually injured brought an individual action. A *179 class action in this shotgun setting would not be fair to the Defendants as well and we cannot overlook that they do have some rights.
In New Jersey, at least, our legislature has seen fit to permit recovery of [treble] damages and counsel fees in consumer fraud actions. The Court, of course, does not know what the law is in the other 24 states in the so-called class, but the reasons for the action of our legislature is to encourage such actions where otherwise it might not pay to bring these suits. This is by far a superior way to deal with the problems than the shotgun approach that's taken by Plaintiffs' counsel. Motion therefore will be preliminarily denied.
We determine that the trial judge was incorrect in denying plaintiff's motion. See generally, In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 461 A.2d 736 (1983).
Rule 4:32-1(a) establishes the general requirements for maintaining a class action.
(a).... One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
In addition, a class must also meet one of three alternative conditions in order to receive class certification. The conditions relevant to this case are expressed in R. 4:32-1(b)(3):
(b) Class Action Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:
....
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.
New Jersey courts, as well as federal courts construing the federal class action rule after which our rule is modelled, have consistently held that the class action rule should be liberally construed. In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736; Riley v. New Rapids Carpet Center, 61 N.J. 218, 228, 294 A.2d 7 (1972); Saldana v. City of Camden, 252 N.J. Super. 188, 196, 599 *180 A.2d 582 (App.Div. 1991); Lusky v. Capasso Bros., 118 N.J. Super. 369, 373, 287 A.2d 736 (App.Div.), certif. denied, 60 N.J. 466, 291 A.2d 16 (1972); Kronisch v. The Howard Savings Institution, 133 N.J. Super. 124, 131, 335 A.2d 587 (Ch.Div. 1975) (Kronisch I), reversed on other grounds, 143 N.J. Super. 423, 363 A.2d 376 (App.Div. 1976) (Kronisch II); Eisen v. Carlisle and Jacquelin (Eisen II), 391 F.2d 555, 563 (2d Cir.1968). Indeed, a class action "should be permitted unless there is a clear showing that it is inappropriate or improper." Lusky, supra, 118 N.J. Super. at 373, 287 A.2d 736; see Riley, supra, 61 N.J. at 228, 294 A.2d 7 (in a consumer fraud case, "a court should be slow to hold that a suit may not proceed as a class action"); Eisen II, 391 F.2d at 563 ("the dismissal in limine of a particular proceeding as not a proper class action is justified only by a clear showing to that effect and after a proper appraisal of all the factors enumerated on the face of the rule itself"). New Jersey case law supports the conclusion that the class action vehicle is particularly appropriate in cases, such as this one, alleging consumer fraud, In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736; Riley, supra, 61 N.J. at 228, 294 A.2d 7, regardless of the particular legal theory advanced. In re Cadillac, 93 N.J. at 426-30, 461 A.2d 736.
The present case also implicates a common characteristic of consumer claims, namely
that the individual claims involve too small an amount to warrant recourse to litigation. Thus, the wrongs would go without redress, and the manufacturer may continue with impunity to place defective products on the market.... A consequence of certification of a class action is the equalization of the ability of the parties to prepare and pay for the advocacy of their rights.
[Id. at 435, 461 A.2d 736 (citations omitted)].
Plaintiffs' counsel here argued that denial of certification would have the effect of terminating the litigation, and expressly noted both the small amount of damages in proportion to the costs involved, and, the costs associated with the need to present expert testimony.
When determining whether a class should be certified, a court is not to make a preliminary determination of the merits of *181 the underlying claims. Eisen v. Carlisle & Jacquelin (Eisen IV), 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); Olive v. Graceland Sales Corp., 61 N.J. 182, 189, 293 A.2d 658 (1972); Kronisch I, supra, 133 N.J. Super. at 135-36, 335 A.2d 587. "The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations." Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir.1975), cert. den., 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); see Riley, supra, 61 N.J. at 223, 294 A.2d 7 ("We of course are not deciding the ultimate factual issues in the case. We have summarized the record to reach the legal questions, and in doing so we accorded plaintiffs every favorable view").
Here, the trial judge observed that because plaintiffs owned "blue flame" units for many years,[6] their claims of "problems of a serious nature" were negated. This finding is inappropriate. From plaintiffs' submissions to the court it appears to us that they were trying to make a prima facie showing that they had problems of the types generally associated with the "blue flame" units, and that such problems were consistent with their claim that all the "blue flame" units contained a common uncorrected, or uncorrectable, defect. In addition, it is clear that New Jersey courts will permit class certification even though individual questions, such as the degree of damages due a particular class member, or reliance by individual class members on defendants' alleged misrepresentations, may remain following resolution of the common questions. In re Cadillac, supra, 93 N.J. at 429-30, 432-35, 461 A.2d 736; Blackie v. Barrack, supra, 524 F.2d at 905 ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment"). Indeed, "[a] fraud perpetrated *182 on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action." Blackie v. Barrack, supra, 524 F.2d at 903.
The time that has passed since the purchase of the heaters has other possible ramifications. The units were manufactured only through 1983. As the damages alleged here are economic only, according to one decision, the Uniform Commercial Code would provide the sole remedy for a breach of warranty. D'Angelo v. Miller Yacht Sales, supra, 261 N.J. Super. at 688, 619 A.2d 689; see Spring Motors Distr., Inc. v. Ford Motor Co., 98 N.J. 555, 577-579, 489 A.2d 660 (1985) (leaving open the question of consumer strict liability claims for economic losses that was answered in D'Angelo).[7] The statute of limitations is set forth in N.J.S.A. 12A:2-725. It establishes a limit of four years following accrual of the cause of action, which, for breach of warranty, "occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and the discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." N.J.S.A. 12A:2-725(2). Where, however, the claims are for property damage (to property other than the heater itself) or personal injury (here eschewed), a strict liability claim may be alleged.[8]
*183 We point out this four-year period of limitation (which does not preempt any fraud or consumer fraud claims, N.J.S.A. 12A:1-103) not to state that all warranty claims were necessarily extinguished in 1987, four years after the last item was manufactured, and a year before this suit was instituted. Rather, we note that specific questions might require resolution either collectively or by each class member who asserts a warranty claim. If there was an explicit warranty of future performance, the statute is extended. N.J.S.A. 12A:2-725(2). If the unit was sold through a distributor, the purchase date by the consumer could further have extended the filing date for the purchaser's complaint. Also, if a breach of an express warranty of future performance is asserted, a failure of performance beyond four years from the sale may still be within the extended statutory limits. N.J.S.A. 12A:2-725(2). If a fraud claim is asserted, the appropriate limitation would be six years from the accrual of the claim. N.J.S.A. 2A:14-1; D'Angelo v. Miller Yacht Sales, supra, 261 N.J. Super. at 688, 619 A.2d 689. Notwithstanding these possible extensions of some purchasers' claims, under the D'Angelo reasoning, other class members, even though entitled to plaintiffs' 1988 filing date, would be barred by the Uniform Commercial Code's four year statute of limitations from their warranty claims, leaving only the fraud counts. The alleged common deception imposed on all of the purchasers would preserve the fraud and fraudulent concealment claims in counts IV and V.[9]
Plaintiffs clearly claimed that despite design modifications during the class period, the harmful defect remained due to an alleged flaw in the product's basic technology. This may or may not be true. Defendants rely heavily on the existence of different models and differing designs. However, whether true or not, the claim of the underlying technological defect presents a common, although *184 contested, question of fact. For the purposes of the motion, the trial judge should have resolved it in plaintiffs' favor.[10] Indeed, the fact that neither the advertising nor the consumer warning differentiated among the models or model years would seem to support, at least preliminarily, the conclusion that the design defect at issue was the same throughout the class period. Nevertheless, this seemed an important factor in the court's denial of class certification.[11]
Rule 4:32-1(a) contains the general requisites for a class action, commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." In re Cadillac, supra, 93 N.J. at 425, 461 A.2d 736. More specifically, Rule 4:32-1(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." The trial judge did not directly address this issue. However, plaintiffs' undisputed claim that the potential class consists of some 35,000 purchasers throughout the United States and Canada meets the "numerosity" requirement. See In re Cadillac, supra, 93 N.J. at 425, 461 A.2d 736 ("[a] class of approximately 7,500 plaintiffs is sufficiently numerous so that joinder is not a satisfactory alternative"). Although figures of a class consisting only of New Jersey purchasers is unavailable, it *185 can be presumed at this point that such a class would also be sufficiently numerous to meet this criterion.
Rule 4:32-1(a)(2) requires that there be "questions of law or fact common to the class." Indeed, under the federal rule, "a single common question is sufficient." In re Asbestos School Litigation, 104 F.R.D. 422, 429 (E.D.Pa. 1984), aff'd in part and vacated in part sub nom. In re School Asbestos Litigation, 789 F.2d 996 (3rd Cir.), cert. den., 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). Common questions both of fact and of law sufficient to meet this criterion appear to exist. Even the trial judge acknowledged such common questions. He stated: "These are some common questions of ... law, no doubt about it and some common questions of fact." He was concerned, however, with additional factual issues unique to each potential claimant. The existence of questions concerning individual representations made to a plaintiff, or relating to proof of damages, should not be a bar to upholding a class action where there are significant common questions as to liability.
Plaintiffs claim to have experienced common problems with their "blue flame" units, and generally to have been misled by defendants' misrepresentations, which, although spanning a period of years, represented a common course of conduct. In addition, plaintiffs claim identically that defendants failed to warn of the hazards associated with their product and failed to adequately test the "blue flame" system before marketing it. Most importantly, plaintiffs claim that the design defect which caused their problems persisted throughout the entire class period, and was inherent in the technology itself.
The plaintiffs in this case, in fact, raised similar legal theories and factual allegations to those raised by the plaintiffs in In re Cadillac, supra, and these should have led to the same result. As in In re Cadillac, the plaintiffs here claimed that defendants are strictly liable to them for placing "in the stream of commerce a defectively designed product" which caused damage to the members of the class. 93 N.J. at 426, 461 A.2d 736. Plaintiffs in the *186 present case further urged that their "blue flame" heaters failed to work properly because of a common design defect, "which manifested itself" in a pattern of common problems, such as shutdown, pulsation, excess soot, noise, and potential hazard resulting from emission of excess amounts of carbon monoxide. Indeed, "[e]ven if the class members cannot prove a specific defect, their common complaints ... might sustain a class action for breach of implied warranty" under appropriate circumstances. In re Cadillac, Id. at 428, 461 A.2d 736. The balance of plaintiffs' claims, as well as defendants' anticipated arguments and defenses, including the "reliance" issue, similarly tracked those in In re Cadillac. Id. at 426-30, 461 A.2d 736.
The third general requirement for class certification is that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." R. 4:32-1(a)(3). Although the trial judge did not specifically address this issue, his remarks concerning the adequacy of representation, R. 4:32-1(a)(4), may implicate this factor as well. The Supreme Court noted:
The requirement that the claims of the representatives of the parties be typical of the class, R. 4:32-1(a)(3), is sometimes equated with the requirement of R. 4:32-1(a)(4) that the representative parties fairly and adequately protect the interests of the class. 3B Moore's Federal Practice ¶ 23.06-2 (1982). The claims of the representatives must "have the essential characteristics common to the claims of the class." Id. All plaintiffs claim that through GM's misrepresentation they bought defective automobiles and that they suffered the same breach of the same warranty.
[In re Cadillac, supra, 93 N.J. at 425, 461 A.2d 736.]
See also In re Asbestos School Litigation, supra, 104 F.R.D. at 429-430. The Court had no difficulty in In re Cadillac in concluding that the claims of the representatives were both typical of those of the remainder of the class, and that the class representatives would adequately protect the interests of the remaining class members.
In the present case, the trial judge's primary concern appears to have been that plaintiffs' claims were "nowhere near as serious as the claims counsel allege exist." This observation focused on the extent of damages, rather than liability. "While the focus is on *187 the relatedness of the named plaintiffs' claims and those of the class members, the harm suffered by the named plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered is of the same type." In re Asbestos School Litigation, supra, 104 F.R.D. at 430 (citation omitted).[12]
Moreover, plaintiffs assert that they seek only economic damages, correctly noting that class members who have also suffered personal injuries as a result of using defendants' product may, if warranted, opt out and proceed independently on those issues. In re Cadillac also lends support to the position that a class may be certified where individual members of the class may have suffered personal injury. 93 N.J. 412, 461 A.2d 736. It is not uncommon for courts to certify class actions involving products or hazards that, in addition to causing economic damage, may have also caused personal injury to some of those exposed. See, e.g., Wehner v. Syntex Corp., 117 F.R.D. 641 (N.D.Cal. 1987) (certification of class seeking to recover "response costs" pursuant to CERCLA for dioxin contamination of class members' property); Joseph v. General Motors Corp., 109 F.R.D. 635 (D.Colo. 1986) (certification of class consisting of current or former owners of automobile with alleged design defect causing "unexpected stalling, hesitation, surging, and poor fuel economy"); In re Three Mile Island Litigation, 87 F.R.D. 433 (M.D.Pa. 1980) (certification of classes seeking recovery for economic harm resulting from an accident at a nuclear facility; denial of certification for class claiming personal injury resulting from the same accident).
Most of the individual units cost approximately $2000 or less, and other costs associated with use of the units (repair, replacement, cleaning, or the like), as claimed by plaintiffs and unrebutted by defendants, seem small. There is nothing in the record to *188 suggest that the named plaintiffs' claims are not typical of those of the class, or that they would not adequately represent the interests of the remaining class members, based on the amount of damages which might be anticipated generally.
Finally, while New Jersey courts, in construing our class action rule, are not bound by the interpretations given the federal rule, Kronisch I, supra, 133 N.J. Super. at 137-38, 335 A.2d 587, our courts have consistently looked to the interpretations given the federal counterpart for guidance. See, e.g., In re Cadillac, supra, 93 N.J. at 424-25, 430-33, 439, 461 A.2d 736; Riley, supra, 61 N.J. at 226-28, 294 A.2d 7. In determining adequacy of representation under the federal rule, the Third Circuit has "identified the elements" appropriate to that inquiry as depending on two factors. In re Asbestos School Litigation, supra, 104 F.R.D. at 430. Thus,
(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.
[Ibid.]
The defendant bears the burden of demonstrating that the proposed representation will be inadequate. Ibid.
Within the context of this case, there is nothing in the record to suggest that plaintiffs' counsel is unqualified to appropriately pursue the litigation, or to properly represent the interests of the class. However, defendants argue that a class comprised of "distributors, dealers and tract housing builders as well as homeowners" are relevant to determinations of typicality and adequacy of representation, as well as to the Rule 4:32-1(b)(3) questions of whether common issues predominate, and whether the proposed class is manageable (Db21-Db22). Even assuming, arguendo, that defendants' contention has merit, the proper response, if such claims are later asserted, would be to certify appropriate subclasses, or require a more narrowly-defined class, rather than to deny class certification entirely. See In re Cadillac, supra, 93 N.J. at 437, 461 A.2d 736 ("A trial court can mold the class, ... and, in an appropriate case, can even decertify a class"); Safran v. United Steelworkers of Am., AFL-CIO, 132 F.R.D. 397, 403-04 (W.D.Pa. *189 1989) (finding the "possibility of antagonistic interests" at the preliminary stage of the case "too speculative to preclude class certification on the basis of inadequate representation," and noting that "any conflicts ... should they arise, can be handled by the formation of subclasses"). In any event, apart from their assertions, defendants offer no proof to rebut the presumption that the proposed plaintiff class meets the requirements of "commonality, typicality, and adequacy of representation." In re Cadillac, supra, 93 N.J. at 425, 461 A.2d 736.
Plaintiff must also meet the requirements of one of the three alternative conditions of R. 4:32-1(b). Pertinent to this case, the trial court must find that the common questions of law or fact predominate over those questions pertaining only to individual members, and that the class action method "is superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b)(3).
With regard to the predominance issue,
[a]lthough plaintiffs' causes of action embrace common legal and factual elements, the critical question remains whether the benefit from the determination in a class action of the existence of a common defect and a common pattern of fraud outweighs the problems of individual actions involving such other issues as causation, reliance, and damages.
[In re Cadillac, supra, 93 N.J. at 430, 461 A.2d 736.]
Generally, "[i]f a `common nucleus of operative facts' is present, predominance may be found." Id. at 431, 461 A.2d 736 (citation omitted). Stated another way, "the basic question is whether the potential class, including absent members, seeks `to remedy a common legal grievance.'" Ibid.
This case presents common legal and factual issues, as well as remaining individual issues, similar to those noted by the Court in In re Cadillac, supra, 93 N.J. at 431, 461 A.2d 736. Thus, the plaintiffs seek to show, among other things, (1) the existence of a design defect common to all "blue flame" burners at the time they were placed into the stream of commerce, (2) the existence of implied warranties of merchantability and fitness, and their breach due to a common product defect, (3) the failure of defendants *190 adequately to test or to warn consumers properly of the defect, (4) whether defendants had knowledge of the alleged defect, (5) whether defendants made misrepresentations to the plaintiff class in marketing the burners, and (6) whether defendants engaged in unconscionable commercial practices. See In re Cadillac, supra, 93 N.J. at 431, 461 A.2d 736. Remaining as individual issues are (1) proof of causation, (2) failure of defendants to cure the defect, (3) actual reliance by class members on defendants' alleged misrepresentations, and (4) damages incurred by each class member. Ibid. As to this last point, "the overwhelming weight of authority' holds that the need for individual damages calculations does not diminish the appropriateness of class action certification where common questions as to liability predominate." In re Asbestos School Litigation, supra, 104 F.R.D. at 432 (citations omitted).
In denying class certification on this point, the trial judge particularly emphasized the potential conflict of laws problem posed by a potential nationwide class composed of members in twenty-five states, the District of Columbia, and Canada. But plaintiffs correctly note that multistate classes have been certified in similar cases in federal courts based on state law. See, e.g., In re School Asbestos Litigation, supra; In re "Agent Orange" Product Liability Litigation, 100 F.R.D. 718 (E.D.N.Y. 1983), mandamus denied sub. nom. In re Diamond Shamrock Chemicals Co., 725 F.2d 858 (2d Cir.), cert. denied, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). Interstate classes have also been certified in state courts. See, e.g., Shutts v. Phillips Pet. Co., 235 Kan. 195, 679 P.2d 1159 (1984), aff'd in part and rev'd in part, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). See discussion in Proposed Final Draft (April 5, 1993), Complex Litigation Project (American Law Institute) p. 212.
The fact that there may be conflict of laws issues does not foreclose the certification of a multistate class. The Supreme Court in Shutts expressly noted that it did not undertake to determine which law should be applied in that case, but expressly *191 reaffirmed an earlier observation "that in many situations a state court may be free to apply one of several choices of law," so long as these respect appropriate constitutional limitations. Shutts, supra, 472 U.S. at 823, 105 S.Ct. at 2980, 86 L.Ed.2d at 649. Thus,
[t]he Shutts opinion merely requires a showing that there are sufficient contacts between the forum state and each individual class member's claims to create forum interests in the litigation such that application of forum law will not be arbitrary or unfair.
[In re Kirschner Medical Corp., 139 F.R.D. 74, 84 (D.Md. 1991).]
More particularly, "[d]enial of certification on this basis ... appears to be the minority approach," and many courts decline "to decide choice of law issues incident to a motion for class certification." Ibid.
New Jersey is free to take the "minority approach," should it choose to do so. See Kronisch I, supra, 133 N.J. Super. at 137-38, 335 A.2d 587. We recognize that such issues hold a substantial potential for complicating litigation. See generally Shutts, supra, 472 U.S. at 814-23, 105 S.Ct. at 2975-80, 86 L.Ed.2d at 643-49 (defendants pointed to actual conflicts existing between the law of the forum and that of several other states which had far more extensive "contacts creating state interests" compared to the claims asserted in the forum state. Ibid.) In the case before us, no specific showing was presented to the trial court, but problems clearly exist. If there were broader claims presented, the problems might be multiplied. Given the sale through intermediaries in other states and Canada, warranties of fitness for a particular purpose would be subject not only to varying factual proofs, but also to possible legal variants. See N.J.S.A. 12A:2-315 (and its U.C.C. counterparts elsewhere), Pawelec v. Digitcom, Inc., 192 N.J. Super. 474, 471 A.2d 60 (App.Div. 1984). Where the claim is for breach of the implied warranty of merchantability, N.J.S.A. 12A:2-314, other states' remedies may be as limited as those expressed in D'Angelo v. Miller Yacht Sales, supra, or may give *192 rise to competing strict liability and warranty claims.[13]
Plaintiffs, however, have limited their claims to fraud and fraudulent concealment, based primarily upon the actions of the manufacturers and those under its control. The additional problems with possible multi-state consumer fraud or other statutory claims raise manageable questions. The problems inherent in certifying a class presenting conflict of laws issues are not unsurmountable; but, as we acknowledge, as the geographical diversity grows, the management problems increase commensurately.
Certainly, however, a class limited to those who have sufficient contacts with New Jersey, could have been certified. Significantly, plaintiffs' position at the hearing on their motion was to accept a class certification consisting solely of New Jersey purchasers if that was the only way to "get a class certified." Under these circumstances, it appears that the trial judge erred to the extent that his outright denial of class certification was based on conflict of laws considerations.
The final prerequisite for class certification requires a determination that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b)(3); In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736. In New Jersey, the general rule that the class action rule should be liberally construed in consumer fraud cases, and the very real possibility that failure to certify the class could result in the end of the litigation, seem to be of particular concern with respect to this inquiry. In re Cadillac, supra, 93 N.J. at 435-36, 461 A.2d 736. This is so, even though the interests of other parties, including the defendants, and the interest of judicial efficiency must also be considered. Ibid.
In the present case, the trial judge expressly found that the class action method would not be a superior method of adjudication, *193 apparently determining that individual litigation would be preferable and that "[t]he magnitude of the class would make it unruly." We disagree. The trial judge never expressly considered plaintiffs' claim that this would effectively end the litigation. Even if the statute of limitation is extended as explained earlier, the small amount of each claim would effectively preclude most suits.
Courts construing the federal class action rule have also stressed the importance of this consideration. Thus, the federal rule
should be construed to permit a class suit where several persons jointly act to the injury of many persons so numerous that their voluntarily, unanimously joining in a suit is concededly improbable and impracticable.
....
To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what we think the class suit practice was to prevent.
[Hohmann v. Packard Instrument Co., supra, 399 F.2d 711, 715 (7th Cir.1968) (citation omitted); see In re Cadillac, supra, 93 N.J. at 435-36, 461 A.2d 736.]
The trial judge never explained why the proposed class, or even the more limited class consisting of only New Jersey purchasers, would be "unruly" to an extent beyond that which would exist in any class action. Moreover, the trial judge in this case never clearly addressed the factors expressly listed in Rule 4:32-1(b)(3) in making his determination. Thus, the record did not disclose the existence of other litigation, either in New Jersey or elsewhere "already commenced by ... members of the class[14]," nor is there any indication that a class action in this case will negatively affect "the interest of members of the class in individually controlling the prosecution ... of separate actions." Finally, the only indication of particular difficulties "likely to be encountered in the management of a class action" in this case is the concern for possible conflict of laws issues in the event a multistate class was to be *194 certified. However, as already discussed, this problem seems amenable to resolution by more narrowly defining the class, rather than by denying class certification entirely. In re Cadillac, supra, 93 N.J. at 437, 461 A.2d 736.
Furthermore, in determining whether another method of litigation, such as individual actions or the use of a test case, would be more appropriate, the remarks of our Supreme Court in In re Cadillac are directly on point with respect to the present case.
Many of the crucial issues are factual and raise substantial problems of proof  e.g., the existence of a design defect, GM's knowledge of the defect, and its intent toward its customers. Those proofs doubtless will require substantial discovery, expert testimony, and trial time, all of which would render uneconomical an individual suit by a single disgruntled customer. As one treatise states: "[I]ndividual actions or a test case may be an inferior alternative to the class action when the economics of the situation make it impossible for the aggrieved members to vindicate their rights by separate actions." 7A Wright, Miller & Kane, Federal Practice & Procedure § 1778 (Supp. 1983). See Riley, supra, 61 N.J. at 225 [294 A.2d 7]. In a case in which the proofs regarding the defendant's conduct will be identical whether or not a class action is certified, and the maintenance of a test case may be prohibitively expensive for an individual consumer, the class action emerges as the superior method of adjudication. See Werfel v. Kramarsky, 61 F.R.D. 674 (S.D.N.Y. 1974) (holding class action superior where individual claims do not warrant separate suits). By contrast, the common issues in Katz [v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.1974)] and Kronisch [Kronisch II, supra,] were more legal than factual  i.e., whether, given the defendants' conduct in both cases, liability should be imposed.
[In re Cadillac, supra, 93 N.J. at 437, 461 A.2d 736.][15]
Finally, despite defendants' concern that they would be "substantially harm[ed]" by disclosure of class certification, we find that the harm alleged, assuming it came to pass, would not, in the context of this case, be "so severe as to render a class action inferior to other methods of litigation." Id. at 438, 461 A.2d 736. Given the fact that the U.S. Consumer Product Safety Commission *195 has already, as of December 1987, issued a safety alert to consumers warning of the potential lethal hazard from carbon monoxide poisoning posed by Blueray "blue flame" units, this argument rings somewhat hollow. Defendants are not entitled to protection against the legitimate risks of liability arising from the marketing of a dangerous product simply to preserve their image of integrity.
In light of the foregoing, we reverse the trial judge's denial of class certification in this case. We direct the trial judge to certify a class to include at least the New Jersey purchasers or users of defendants' products.
Reversed and remanded for further proceedings in conformity with this opinion.
NOTES
[1] We have been informed that plaintiff Tito Delgozzo died while this appeal was pending. His executrix, Rose Delgozzo has by motion granted May 10th, 1993, been substituted as plaintiff in his stead.
[2] Action on this case, including determination of the class, was stayed for several years pending the outcome of defendants' motion to dismiss a "companion case," which plaintiffs had filed in federal district court in 1988, and which was then heard by the Third Circuit. Glessner v. Kenny, 952 F.2d 702, 705 (3rd Cir.1991). Plaintiffs there alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68 (1988), and also asserted various state law claims. The District Court dismissed plaintiffs' RICO claims, and as a result, also dismissed the pendent state law claims without prejudice. Id. at 706. On appeal, the Third Circuit affirmed the District Court's actions, noting, "We do not minimize either the seriousness of the alleged misrepresentations or the injuries they may have caused. However, ... civil RICO does not become the claim of choice for every fraud suit." Id. at 715. Neither the District Court nor the Third Circuit ever decided a motion for class certification in the federal action, nor did either court reach the merits of plaintiffs' state law claims.
[3] In response to an inquiry we made at oral argument, Meenan Oil Co.'s president, defendant Vermylen, has informed us that there is only one other pending claim against defendant relating to the company's Blueray blue flame furnaces or boilers. The case is pending in New Hampshire. It is not a class action. Although there is a personal injury claim stated, it appears to be basically a property damage claim based upon heater defects.
[4] Defendants assert that in 1983, defendant KOV was incorporated and acquired all of Meenan's stock and that, in 1990, KOV and Meenan merged to form Meenan Oil Co.
[5] Apparently, traditional oil furnaces and boilers burn with a yellow flame, while defendants' units burn oil with a blue flame.
[6] The record seems to indicate that the named plaintiffs, in fact, had "blue flame" units operating in their homes for varying times. Only Delgozzo seems to have had his in operation from 1980, when he purchased one, until at least the time of his deposition in June 1992. The Hecks' unit was converted to a "yellow flame" burner after about two heating seasons, and Slimm and Capritti apparently had their unit removed after being told it couldn't be converted.
[7] As noted at the outset, the parties were requested to file supplemental briefs on the effect of D'Angelo on this case. The parties were specifically asked to comment upon whether D'Angelo was correctly decided. Both agree that D'Angelo properly barred general warranty claims after four years.
[8] Since this claim was initiated after the effective date of the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 et seq., the claim might be based on the statute rather than the common law strict liability claim. However, the Act only covers claims for "harm" as defined in the statute. N.J.S.A. 2A:58C-1b(2). Damages to the product itself would not be such "harm." N.J.S.A. 2A:58C-1b(2)(a). If there were other losses, such as soot damage to the house, the Act would apply. Thus there may be both traditional strict liability and statutory product liability claims here. Any differences, however, in a case such as this are slight.
[9] As noted earlier, the parties agreed that D'Angelo v. Miller Yacht Sales, in the words of plaintiffs' supplemental brief, "correctly determined that the Spring Motors Rule should govern the remedies of a consumer buyer" for breach of express or implied warranties.
[10] In fact, the trial court seems to have resolved the question in favor of defendants, observing that "[t]hroughout the memo the Plaintiffs speak of Blue Ray Heaters as if all heaters were the same. Yet it is alleged by competent legal evidence that they are not in the affidavit of ... [Vermylen]." The court ignored the submission by plaintiffs' expert, which supported plaintiffs' position. Obviously neither party submitted full proof in support of their respective positions, since such evidentiary showings are more appropriately reserved for trial on the merits.
[11] The trial judge noted that "[e]ven Glessner," formerly a named plaintiff, acknowledged that the "blue flame" units "were the subject of design enhancements during the class period." However, this may be a misinterpretation of Glessner's remarks. In his deposition, submitted to the trial court by defendants, Glessner appears to be referring to the particular unit installed in his home, and not to defendants' product line, generally.
[12] The district court's analysis of the factors comprising Rule 23(a), the federal rule analog of our Rule 4:32-1(a), was not adversely affected in the Third Circuit's subsequent partial affirmance. The district court's Rule 23(a) analysis was expressly affirmed "on the basis of the district court's analysis." In re School Asbestos Litigation, supra, 789 F.2d at 1009-1010.
[13] See also the effects of the counsel fee shifting provisions of the Magnuson-Moss Warranty Federal Trade Commission Improvement Act, 15 U.S.C.A. § 2301 et seq., as well as 15 U.S.C.A. § 2310(d)(2).
[14] See note 3, supra, concerning the one other claim, pending in New Hampshire.
[15] The Appellate Division in Kronisch II reversed solely on the ground that, in that case, which centered on resolution of an "essentially legal issue," the test case was a superior method of litigation. Kronisch II, supra, 143 N.J. Super. at 429, 363 A.2d 376. The court expressly deferred consideration of the propriety of a class action on the balance of the issues, pending resolution of the legal issue. Id. at 431, 363 A.2d 376. The present case more closely resembles the situation in In re Cadillac, in which common factual issues predominate.