922 A.2d 710

MICHELLE ILIADIS AND ANGELA NELSON–CROXTON, INDIVIDUALLY ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS–APPELLANTS, v. WAL–MART STORES, INC., A DELAWARE CORPORATION, SAM'S CLUB, AN OPERATING SEGMENT OF WAL–MART, INC., DERRICK ZIMMER AND GLEN SPENCER, DEFENDANTS–RESPONDENTS, AND AND PRESENTLY UNIDENTIFIED JOHN DOES 1 THROUGH 10, DEFENDANTS.

Argued April 5, 2007—Decided May 31, 2007.

90

*Judith L. Spanier,* a member of the New York bar, argued the cause for appellants (*Hanlon & Niemann,* attorneys; *Ms. Spanier* and *Christopher J. Hanlon,* of counsel and on the briefs).

*Michael K. Furey,* argued the cause for respondents (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Furey* and *Sandi F. Dubin,* on the briefs).

*Mark Hanna,* submitted a brief on behalf of *amicus curiae* United Food and Commercial Workers Union District Council of New York and Northern New Jersey (*Davis, Cowell & Bowe,* attorneys).

*David R. Kott,* submitted a brief on behalf of *amicus curiae* New Jersey Business & Industry Association (*McCarter & English,* attorneys; *Mr. Kott, Adam N. Saravay* and *Edward J. Fanning, Jr.,* of counsel and on the brief).

Chief Justice ZAZZALI delivered the opinion of the Court.

The named plaintiffs, former hourly employees of defendant Wal–Mart Stores, Inc., allege in their class-action complaint that Wal–Mart, through centralized control over business operations, denied them earned rest and meal breaks and forced them to work "off-the-clock." In seeking to represent a state-wide class of similarly-situated Wal–Mart hourly employees, plaintiffs claim that defendant engaged in widespread conduct in contravention of published corporate policy, statutory law, and administrative regulations. Citing concerns about the manageability of the litigation, the trial court denied class certification to the proposed class of approximately 72,000 current and former Wal–Mart employees. The Appellate Division affirmed.

In this appeal, we must determine whether the putative class of current and former employees may be certified pursuant to *Rule* 4:32–1. We find that common questions of law and fact predominate over individualized questions and that the class-action device is superior to other available methods of adjudicating this dispute. We therefore reverse and remand for the entry of an order certifying the class. By allowing this manageable litigation to proceed, we permit a class of hourly, retail employees to unite and—on an equal footing with their adversary—to seek relief for their "small claims" that arise from defendant's alleged violation of

contractual promises, statutory enactments, and regulatory mandates.

## I.

### A.

Plaintiffs ask us to certify a class of "all current and former hourly employees of Wal–Mart (including Wal–Mart Stores, Supercenters and Sam's Clubs) in the State of New Jersey during the period May 30, 1996 to the present," (formatting altered), a class consisting of approximately 72,000 workers. When deciding whether to certify a class, we "accord[ ] plaintiffs every favorable view" of the complaint and record. *Riley v. New Rapids Carpet Ctr.*, 61 *N.J.* 218, 223, 294 *A.*2d 7 (1972); *see also Delgozzo v. Kenny*, 266 *N.J.Super.* 169, 181, 628 *A.*2d 1080 (App.Div.1993) (accepting as true all substantive allegations of party seeking certification).

Plaintiffs allege that Wal–Mart, in an effort to reduce labor costs and increase profits, systematically declined to honor its contractual promises concerning rest and meal breaks. Plaintiffs also maintain that Wal–Mart failed to compensate its employees for all time worked by forcing employees to work through meal breaks, by locking employees in retail stores after they had clocked out, and by coercing employees to work off-the-clock. Premised on those allegations, the putative class advances nine causes of action: (1) breach of implied-in-fact contract regarding missed rest and meal breaks; (2) breach of implied-in-fact contract regarding off-the-clock work; (3) breach of unilateral contract regarding missed rest and meal breaks; (4) breach of unilateral contract regarding off-the-clock work; (5) breach of the covenant of good faith and fair dealing; (6) violation of the New Jersey State Wage and Hour Law, *N.J.S.A.* 34:11–56a to –56a30 (requiring overtime pay); (7) violation of *N.J.A.C.* 12:56.5.2 (mandating compensation for all hours worked); (8) entitlement to restitution; and (9) unjust enrichment.

Defendant operates forty-four Wal–Mart stores, one Wal–Mart Supercenter, and nine Sam's Clubs in New Jersey. Wal–Mart, *2007 Annual Report* 63 *available at* http://walmartstores.com/Files/2007_annual_report.pdf [hereinafter *Annual Report*]. Management within those stores is multi-layered, with numerous managers supervising hourly employees who are categorized in approximately eighty-five different Wal–Mart job classifications and one hundred Sam's Club job classifications.

A corporate-wide policy governing rest and meal breaks—Wal–Mart Corporate Policy PD–07—applies uniformly to all Wal–Mart hourly employees. Pursuant to that policy, employees are entitled to paid rest periods based on the number of consecutive hours in their assigned shift. A shift of three to six hours merits one uninterrupted, fifteen-minute paid break, and a shift exceeding six hours earns two such breaks. Each hourly employee's immediate supervisor is responsible for scheduling rest breaks.

Corporate Policy PD–07 also governs meal breaks. That policy entitles hourly employees to a supervisor-scheduled unpaid meal break of thirty minutes for every shift in excess of six hours. If a rest or meal break is interrupted by work, in addition to providing a substitute break, Wal–Mart policy requires the company to compensate the affected employee for the time worked. Failure to comply with the directives of Corporate Policy PD–07 subjects both supervisors and employees to discipline. In fact, a former President and Chief Executive Officer of the Wal–Mart Stores Division referred to Corporate Policy PD–07 as "the LAW," stating that its mandates are "NOT optional."

Wal–Mart policy also requires accurate payroll records. "No Wal–Mart Associate should perform work for the Company without compensation," and failure to adhere to that rule may warrant discipline. According to its Associate Handbook, Wal–Mart's "expectation is very clear":

> Always clock in before beginning your work day and at other appropriate times ... Your hard work is appreciated, and we want to pay you for this work. *Remember, working off-the-clock is not only against Wal–Mart policy—it's against the law. Always clock in when you are working—Always! There are no exceptions.*

Nevertheless, if an employee works off-the-clock, Wal–Mart has established a protocol to ensure appropriate compensation, allowing employees to submit documentation to correct discrepancies.

The foregoing policies are widely disseminated and communicated to employees through varied media. For example, the policies are explained to new employees at their orientations and reinforced in an Associate Handbook. However, that handbook includes a disclaimer, expressly stating that it "is not a contract."

Plaintiffs contend that Wal–Mart systematically ignores and disregards those written policies. Wal–Mart, it is claimed, provides financial incentives to store managers to increase store profits by lowering store expenses. This approach allegedly has produced a work environment where Wal–Mart regularly contravenes uniformly-declared policy, as well as statutory and regulatory law. According to plaintiffs, that scheme and defendant's "gross[ ] understaffing" of its retail stores has made off-the-clock work "essentially mandatory," as evidenced by corporate e-mail encouraging store managers to "get volunteers" to "cut hours."

In addition to obtaining certifications from current and former employees supporting their respective contentions, both parties retained experts to substantiate their positions. Plaintiffs first offered the report of L. Scott Baggett, Ph.D., a consulting statistician, who analyzed 31,466 shifts from seven New Jersey Wal–Mart stores. Baggett found a "statistically significant" deficiency in the quantity and duration of earned breaks. Per pay period, Baggett noted that ninety-three percent of employees suffered a shortfall in the length of their earned breaks and eighty-five percent of employees experienced a deficiency in the number of earned rest and meal breaks. Baggett then supplemented his report, finding that nearly sixty-three percent of employees in the sample experienced at least five missed or shortened breaks per pay period. Additionally, Baggett estimated that the members of the proposed class suffered a deficiency of 1.3 million hours in earned rest periods since 1996. In a word, "[a]ssociates did not receive the rest break time nor the meal time they earned."

Baggett also discovered a practice of shift editing by management. Specifically, when an employee failed to punch out at the end of a shift, the employee was credited with only a one-minute-long shift, regardless of the employee's actual time worked. Baggett recorded 250 management-edited one-minute shifts in his sample, leading him to observe that "[a] disproportionately large number of shifts are edited by Wal–Mart management such that pay for hours worked is minimized."

Baggett's report is consistent, in part, with the July 2000 findings of an internal, nation-wide Wal–Mart audit. Conducted over a week-long period, that audit of 127 Wal–Mart stores, including at least one New Jersey store, was distributed to senior officials including regional vice presidents. The internal report concluded that "[s]tores were not in compliance with company and state regulations concerning the allotment of breaks and meals as 76,472 exceptions were noted."[1] Soon after, in February 2001, Wal–Mart altered its policy, no longer requiring employees to clock in or out for their rest breaks. Although plaintiffs are suspicious of the policy shift's timing, Wal–Mart asserts that the change was benignly instituted because employees were paid for their rest periods, thereby undermining any payroll justification for documenting such breaks.

Plaintiffs also submitted the report of Martin M. Shapiro, Ph.D., a professor at Emory University. His review of time and attendance data from New Jersey stores revealed a "pervasive and consistent pattern of missed meal breaks . . . and . . . missed rest breaks." For example, he found that employees who were logged out for payroll purposes were simultaneously logged on to cash registers and training devices, indicating off-the-clock labor.

Wal–Mart countered with the report of Paul F. White, Ph.D., a specialist in statistical analysis of employment practices, who

---

[1] A co-author of that report has since disclaimed the internal audit, stating that, in preparing the report, she erroneously understood a missed time clock punch as equaling a missed rest or meal break.

criticized the findings and assumptions of Baggett and Shapiro. White contended that Shapiro's report disregarded structural differences between the analyzed databases and discounted alternative, legitimate explanations for missed breaks. For example, White observed that missed breaks are often voluntary and the result of personal circumstances, such as an employee's desire to leave work early for an appointment or familial responsibilities. In addition, White asserted that both Baggett and Shapiro improperly assumed that a missed punch of the time clock equaled a missed break. Because of those methodological faults, White declared that Baggett's "naïve approach ignore[d] reality" and described Shapiro's conclusions as "vague and unsubstantiated."

B.

The Law Division denied class status to plaintiffs, finding that manageability was "the impediment to certification." In view of that concern, the trial court held that plaintiffs failed to satisfy the "critical question" whether their allegations met the predominance and superiority requirements of *Rule* 4:32–1(b)(3). The court found that the litigation's common questions did not predominate over the "host of individual issues" raised by Wal–Mart, issues premised on "variations in the employee population." The court also rejected plaintiffs' statistical analysis, finding that the proffered expert reports did not "resolve, or obviate the need for resolution of, individual issues of injury and the quantum of damages." Rather, the court found that plaintiffs' statistical evidence would deny Wal–Mart its ability to challenge the claims of individual class members and assert affirmative defenses: "The issue is whether Wal–Mart can be deprived of contesting issues regarding individual employees. If the answer is no, which is what this [c]ourt believes, common issues do not predominate."

The trial court also held that class members had an alternative, superior avenue for redress-the Wage Collection Division of the Department of Labor under the Wage and Hour Law, *N.J.S.A.* 34:11–56a to –56a30. According to the Law Division, that "virtual-

ly cost free" forum was superior to class litigation. The court concluded that "the overwhelming difficulty of managing this class action due to the individual issues that must be addressed ... [and] the fact that employees have an inexpensive and efficient remedy, causes this [c]ourt to conclude that [p]laintiffs have failed to satisfy either the predominance or the superiority requirements" of *Rule* 4:32–1(b)(3).

Echoing the trial court's concerns, the Appellate Division affirmed. The panel stated:

> The trial court in this matter pointed out in its memorandum of decision a number of factors that led to its determination in this regard, all revolving around the court's view that individual factual determinations would have to be made of the circumstances under which a particular employee missed a break or worked off-the-clock. We are satisfied that the trial court was correct in this regard. [*Iliadis v. Wal–Mart Stores, Inc.,* 387 *N.J.Super.* 405, 418–19, 904 *A.*2d 736 (2006).]

We granted plaintiffs' motion for leave to appeal, 188 *N.J.* 570, 911 *A.*2d 64 (2006), and permitted the New Jersey Business & Industry Association (NJBIA) and the United Food and Commercial Workers Union District Council of New York and Northern New Jersey (UFCW) to submit amicus curiae briefs.

## II.

According to plaintiffs, Wal–Mart has "fostered, encouraged, and incentivized" a corporate culture in which published policies are systematically ignored, causing associates to work through promised breaks and making off-the-clock work obligatory. Although plaintiffs acknowledge that differences exist among class members, those individual issues, they argue, pale in comparison to Wal–Mart's pervasive policy of denying employees their earned breaks and compensation—a policy that, according to plaintiffs, is evident from Wal–Mart's corporate documents and records. Plaintiffs also contend that class litigation is superior to other forms of adjudication. Specifically, they assert that the Wage Collection Division provides inferior and inadequate relief due to its procedural strictures and its abbreviated two-year statute of limitations.

Conversely, Wal–Mart seeks an affirmance of the lower courts' rulings. Wal–Mart argues that the "smorgasbord" of individual issues presented by this dispute—such as variations in employee experiences, disparate orientations attended, employees' legitimate reasons for foregoing breaks, and the individualized nature of damages incurred, if any—overwhelm the common questions advanced by plaintiff. Wal–Mart also challenges plaintiffs' expert reports, by labeling them as "vague" and "flawed," and contending that reliance on statistical extrapolation will prevent it from fully exploring its defenses and challenging individual class members' claims. In respect of superiority, Wal–Mart maintains that the Law Division properly concluded that the Wage Collection Division provides a superior, alternative forum to class litigation. That administrative forum, according to defendant, permits aggrieved employees to seek redress in a cost-efficient manner.

As amicus, NJBIA contends that plaintiffs misconstrue precedent and that certification would "unfairly prejudice" the rights of Wal–Mart and others doing business in New Jersey. Specifically, NJBIA asserts that certification will adversely affect court dockets and encourage industry to flee the State due to "a perceived anti-business certification standard."

UFCW declares that "[t]his case, perhaps more than any other imaginable set of facts, requires class certification." Accordingly to UFCW, the need for certification is "particularly acute for low-paid retail workers[,] ... many of whom are recent immigrants, single parents, disabled, senior citizens or under-educated." UFCW further argues that the Wage Collection Division's procedural rules will make administrative relief "difficult and taxing" to obtain for plaintiffs. Finally, UFCW contends that trial courts are capable of overseeing the proposed class litigation, as demonstrated by the successful management of similar litigation in California and Pennsylvania.

In addressing the question presented, we first discuss our State's historical construction of the class-action rule, the purposes of class litigation, and the requirements for class certification. We

then focus our attention on the predominance and superiority requirements and determine whether the trial court abused its discretion in this matter. Finally, because of its significance in this and other complex disputes, we separately consider the manageability of the proposed class action.

### III.

### A.

■ The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 *U.S.* 682, 700–01, 99 *S.Ct.* 2545, 2558, 61 *L.Ed.*2d 176, 193 (1979). Governed in New Jersey by *Rule* 4:32–1, the class action is a joinder device in which a court authorizes "a representative with typical claims to sue on behalf of, and stand in judgment for," a group of similarly-situated litigants. 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 1.1 at 2 (4th ed. 2002). The device "was an invention of equity" that enabled litigation to proceed "in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable." *Hansberry v. Lee,* 311 *U.S.* 32, 41, 61 *S.Ct.* 115, 118, 85 *L.Ed.* 22, 27 (1940).

■ "New Jersey courts, as well as federal courts construing the federal class action rule after which our rule is modelled [sic], have consistently held that the class action rule should be liberally construed." *Delgozzo, supra,* 266 *N.J.Super.* at 179, 628 *A.*2d 1080 (collecting cases); *see also Varacallo v. Mass. Mut. Life Ins. Co.,* 332 *N.J.Super.* 31, 45, 752 *A.*2d 807 (App.Div.2000) (holding, in consumer context, that "class actions should be liberally allowed ... under circumstances that would make individual actions uneconomical to pursue"). Accordingly, a class action "should lie unless it is clearly infeasible." *Riley, supra,* 61 *N.J.* at 225, 294 *A.*2d 7; *see also Esplin v. Hirschi,* 402 *F.*2d 94, 99 (10th Cir.1968) ("[I]f there is to be an error made, let it be in favor and not

against the maintenance of the class action."), *cert. denied,* 394 *U.S.* 928, 89 *S.Ct.* 1194, 22 *L.Ed.*2d 459 (1969).

■ When making certification determinations, "the best policy" is to interpret the class-action rule "so as to promote the purposes underlying the rule." 5 James W. Moore et al., *Moore's Federal Practice—Civil* § 23.03 (3d ed. 1997). Unitary adjudication through class litigation furthers numerous practical purposes, including judicial economy, cost-effectiveness, convenience, consistent treatment of class members, protection of defendants from inconsistent obligations, and allocation of litigation costs among numerous, similarly-situated litigants. *See, e.g., Crown, Cork & Seal Co. v. Parker,* 462 *U.S.* 345, 349, 103 *S.Ct.* 2392, 2395, 76 *L.Ed.*2d 628, 633 (1983); *United States Parole Comm'n v. Geraghty,* 445 *U.S.* 388, 403, 100 *S.Ct.* 1202, 1212, 63 *L.Ed.*2d 479, 494–95 (1980); *In re Cadillac V8-6-4 Class Action,* 93 *N.J.* 412, 430, 461 *A.*2d 736 (1983).

■ The class action in New Jersey also helps to equalize adversaries, a purpose that is even more compelling when the proposed class consists of people with small claims. In such disputes, where the claims are, in isolation, "too small . . . to warrant recourse to litigation," the class-action device equalizes the claimants' ability to zealously advocate their positions. *In re Cadillac, supra,* 93 *N.J.* at 435, 461 *A.*2d 736. That equalization principle "remedies the incentive problem facing litigants who seek only a small recovery." *Muhammad v. County Bank of Rehoboth Beach,* 189 *N.J.* 1, 17, 912 *A.*2d 88 (2006), *certif. denied,* —— *U.S.* ——, 127 *S.Ct.* 2032, 167 *L.Ed.*2d 763 (2007). In short, the class action's equalization function opens the courthouse doors for those who cannot enter alone.

The class action's "historic mission of taking care of the smaller guy" has been widely recognized. *See* Marvin E. Frankel, *Amended Rule 23 From a Judge's Point of View,* 32 *Antitrust L.J.* 295, 299 (1966) (quotation omitted). For example, the United States Supreme Court observed that the drafters of the federal class-action rule sought to vindicate "the rights of groups of people

who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 *U.S.* 591, 617, 117 *S.Ct.* 2231, 2246, 138 *L.Ed.*2d 689, 708–09 (1997) (quotation omitted). The Court continued:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.
>
> [*Ibid.* (quotation omitted).]

*See also Deposit Guar. Nat'l Bank of Jackson, Miss. v. Roper*, 445 *U.S.* 326, 339, 100 *S.Ct.* 1166, 1175, 63 *L.Ed.*2d 427, 440 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").

When one inflicts minor harm across a dispersed population, "the defendant is, as a practical matter, immune from liability unless a class is certified." Stephen C. Yeazell, *Civil Procedure* 966 (5th ed. 2000). This Court, therefore, has been hesitant to provide defendants procedural shelter through a restrictive reading of the class-action rule. In *Riley, supra*, we observed:

> If each victim were remitted to an individual suit, the remedy could be illusory, for the individual loss may be too small to warrant a suit or the victim too disadvantaged to seek relief. Thus the wrongs would go without redress and there would be no deterrence to further aggressions.
>
> [61 *N.J.* at 225, 294 *A.*2d 7.]

*Accord In re Cadillac, supra*, 93 *N.J.* at 435, 461 *A.*2d 736 (finding, in case where individual claimants suffered modest damages, that without certification, "wrongs would go without redress"); *see also* Philip Stephen Fuoco & Joseph A. Osefchen, *Leveling the Playing Field in the Garden State: A Guide to New Jersey Class Action Case Law*, 37 *Rutgers L.J.* 399, 423–24 (2006) (arguing that New Jersey's class-action rule eliminates any "safe harbor" for defendants who inflict small damages on diffuse population).

## B.

To obtain class status, the party seeking certification must establish that the four prerequisites of *Rule* 4:32–1(a) are satisfied.[2] Class certification is appropriate only if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. [*R.* 4:32–1(a).]

Here, the Law Division concluded that those requirements were satisfied, and the parties do not challenge that finding.

In addition to those general prerequisites, the class applicant must also satisfy the requirements of one of the three alternative types of class actions described in *Rule* 4:32–1(b). The present appeal implicates *Rule* 4:32–1(b)(3), which requires that: "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." (Emphasis added).

In making the predominance and superiority assessments, a certifying court must undertake a "rigorous analysis" to

---

[2] Class certification presupposes the existence of a properly defined class. Thus, "[e]ven before one reaches the four prerequisites for a class action, there must be an adequately defined class." Richard L. Marcus & Edward F. Sherman, *Complex Litigation: Cases and Materials on Advanced Civil Procedure* 231 (4th ed. 2004). "[T]he proposed class must be sufficiently identifiable without being overly broad. The proposed class may not be amorphous, vague, or indeterminate and it must be administratively feasible to determine whether a given individual is a member of the class." *White v. Williams*, 208 *F.R.D.* 123, 129 (D.N.J.2002) (quotations and internal citation omitted).

Wal–Mart argues that the proposed class is overly broad because it includes employees who never missed breaks and who never worked off-the-clock. However, we agree with the trial court's determination that, at this preliminary stage, it is inappropriate to narrow the class definition. As the trial court observed, the class may later be altered or amended to accommodate any definitional problems. *See R.* 4:32–2(a).

determine if the *Rule's* requirements have been satisfied. *Carroll v. Cellco P'ship,* 313 *N.J.Super.* 488, 495, 713 *A.*2d 509 (App.Div. 1998) (quoting *Gen. Tele. Co. of the Sw. v. Falcon,* 457 *U.S.* 147, 161, 102 *S.Ct.* 2364, 2372, 72 *L.Ed.*2d 740, 752 (1982)). That scrutiny requires courts to look "beyond the pleadings [to] ... understand the claims, defenses, relevant facts, and applicable substantive law." *Ibid.* (quotation omitted). Although class certification does not occasion an examination of the dispute's merits, *Olive v. Graceland Sales Corp.,* 61 *N.J.* 182, 189, 293 *A.*2d 658 (1972); *see also Castano v. Am. Tobacco Co.,* 84 *F.*3d 734, 744 (5th Cir.1996) (noting "unremarkable proposition that the strength of a plaintiff's claim should not affect the certification decision"), a cursory review of the pleadings is nonetheless insufficient. "The 'rigorous analysis requirement' means that a class is not maintainable merely because the complaint parrots the legal requirements" of the class-action rule. Yeazell, *supra,* at 969.

Accordingly, an examination of the predominance and superiority requirements—the disputed issues in this appeal—must include consideration of the following factors:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; [and]

. . . .

(D) the difficulties likely to be encountered in the management of a class action. [*R.* 4:32–1(b)(3).[3]]

The trial court found that factors (A) and (B) weighed in plaintiffs' favor. However, the trial court declined to certify the class based on the final and most disputed factor: manageability. Therefore, we now consider the predominance and superiority requirements, and then, because of their importance in the pres-

---

[3] A fourth factor, "the desirability or undesirability in concentrating the litigation of the claims in the particular forum," was added to our court rules on September 1, 2006, two weeks after the filing of the Appellate Division's opinion in this matter. *See R.* 4:32–1(b)(3)(C). In light of that timing, we do not consider that factor in our analysis.

ent litigation, we address the manageability concerns raised by the trial court.

## IV.

### A.

To establish predominance, a class representative must demonstrate "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *R.* 4:32–1(b)(3). That inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc., supra,* 521 *U.S.* at 623, 117 *S.Ct.* at 2249, 138 *L.Ed.*2d at 712.

Some general principles guide us in this "pragmatic assessment." Moore, *supra,* § 23.45. First, the number and, more important, the significance of common questions must be considered. *See Carroll, supra,* 313 *N.J.Super.* at 499, 713 *A.2d* 509 ("Predominance is not, however, determined by adding up the number of common and individual issues and determining which is greater."). Second, a court must decide whether the "benefit from the determination in a class action [of common questions] outweighs the problems of individual actions." *In re Cadillac, supra,* 93 *N.J.* at 430, 461 *A.*2d 736. Third, predominance requires, at minimum, a "common nucleus of operative facts." *Id.* at 431, 461 *A.*2d 736 (quotation omitted).

Notably, predominance does not require the absence of individual issues or that the common issues dispose of the entire dispute. *See Strawn v. Canuso,* 140 *N.J.* 43, 67, 657 *A.*2d 420 (1995), *superseded on other grounds by, L.* 1995, *c.* 253 (codified at *N.J.S.A.* 46:3C–10), *as recognized in Nobrega v. Edison Glen Assoc.,* 167 *N.J.* 520, 772 *A.*2d 368 (2001). Individual questions of law or fact may remain following resolution of common questions. *Varacallo, supra,* 332 *N.J.Super.* at 31, 45, 752 *A.*2d 807. Predominance does not require that all issues be identical among class members or that each class member be affected in precisely the

same manner. *See Fiore v. Hudson County Employees Pension Comm'n,* 151 *N.J.Super.* 524, 528, 377 *A.*2d 702 (App.Div.1977).

### B.

Mindful of those general principles, we heed our prior observation that "the answer to the issue of predominance is found ... in a close analysis of the facts and law." *In re Cadillac, supra,* 93 *N.J.* at 434, 461 *A.*2d 736. To conduct that analysis, we first must identify the relevant legal issues in the present appeal.

First, plaintiffs allege breach of implied-in-fact contracts concerning rest and meal breaks and off-the-clock work. Such contracts arise from promises implied by words and conduct in light of the surrounding circumstances. *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford,* 144 *N.J.* 564, 574, 677 *A.*2d 747 (1996). Implied-in-fact contracts are formed by conditions manifested by words and inferred from circumstances, thus entailing consideration of factors such as oral representations, employee manuals, and party conduct. *See Troy v. Rutgers,* 168 *N.J.* 354, 365, 774 *A.*2d 476 (2001).

Second, the proposed class seeks recovery for breach of unilateral contracts, allegedly embodied in the Associate Handbook. In a unilateral contract, one party's promise becomes enforceable only on the performance of the other party's obligation. *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 302, 491 *A.*2d 1257 (1985). To recover, plaintiffs must establish that they acted in accordance with the Associate Handbook—if a trier of fact deems it contractual—and that Wal–Mart did not honor its promises.

Third, plaintiffs allege breach of the covenant of good faith and fair dealing, a component of every contract, *see, e.g., Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 420, 690 *A.*2d 575 (1997). "Good faith" entails adherence to "community standards of decency, fairness or reasonableness," *Wilson v. Amerada Hess Corp.,* 168 *N.J.* 236, 245, 773 *A.*2d 1121 (2001) (quotation

omitted), and requires a party to refrain from "destroying or injuring the right of the other party to receive" its contractual benefits, *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 *N.J.* 210, 224–25, 864 *A.*2d 387 (2005) (quotation omitted). A plaintiff must also prove the defendant's "bad motive or intention." *Id.* at 225, 864 *A.*2d 387.

 Fourth, the proposed class asserts violations of the Wage and Hour Law, *N.J.S.A.* 34:11–56a to –56a30, which directs employers to compensate employees who work in excess of forty hours a week with an overtime rate of "1½ times" the employees' regular hourly wage. *N.J.S.A.* 34:11–56a4. Uncertainty regarding damages does not foreclose such claims. "[D]amages need not be proved with precision where that is impractical or impossible. . . . [M]ere uncertainty as to the amount will not preclude recovery." *Mosley v. Femina Fashions, Inc.*, 356 *N.J.Super.* 118, 128, 811 *A.*2d 910 (App.Div.2002) (quotations omitted), *certif. denied*, 176 *N.J.* 279, 822 *A.*2d 609 (2003).

Fifth, plaintiffs allege violation of *N.J.A.C.* 12:56–5.2, which provides that "all the time the employee is required to be at his or her place of work or on duty shall be counted as hours worked."

 Finally, in addition to seeking restitution, the putative class seeks to disgorge Wal–Mart of any benefits unjustly obtained. To establish a claim for unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 *N.J.* 539, 554, 641 *A.*2d 519 (1994). That quasi-contract doctrine also "requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Ibid.*

In its answer, Wal–Mart advances thirty-four affirmative defenses. Those defenses, which are of both a procedural and substantive nature, run the gamut from plaintiffs' failure to state

claims upon which relief can be granted and their inability to comply with applicable statutes of limitation to defenses focused on individual class members, such as estoppel, waiver, and unclean hands.

## C.

The core of the present dispute is whether Wal–Mart engaged in a systematic and widespread practice of disregarding its contractual, statutory, and regulatory obligations to hourly employees in this State by refusing to provide earned rest and meal breaks and by encouraging off-the-clock work. Essential to that issue are other salient and common questions, most notably the meaning and significance of Wal–Mart's corporate policies concerning breaks and off-the-clock work. The impact of the Associate Handbook's disclaimer and the uniformity of new employee orientation also are prominent common questions.

A trier of fact may appropriately consider whether Wal–Mart promoted uncompensated work and created a work environment where uniformly applicable policies were ignored as part of a corporate-wide effort to reduce labor expenses. Related common questions include: the extent of Wal–Mart's corporate control over various aspects of its New Jersey retail stores, such as scheduling, payroll, staffing, training, and compensation; the structure of the bonus incentives provided to store managers; whether there was a practice of altering employee time records; Wal–Mart's constructive or actual knowledge of off-the-clock work and missed breaks; and whether Wal–Mart understaffed its stores in expectation of off-the-clock work. Additionally, whether Wal–Mart was enriched from its alleged conduct and, if so, whether such benefit was unjust, are common questions.

Common evidentiary questions also surround the expert reports of Baggett, Shapiro, and White; Wal–Mart's July 2000 internal audit, recanted by a co-author; and Wal–Mart's other business records. Significant points of contention relate to reliability, admissibility, and credibility. Those questions apply uniformly to

all members of the proposed class. Although the weight and merits of those reports and records are beyond our review here, *see Olive, supra,* 61 *N.J.* at 189, 293 *A.*2d 658, those evidentiary questions apply uniformly to the proposed class members' claims.

To be sure, as plaintiffs conceded at oral argument, resolution of those and other common questions may not dispose of the litigation. Individual questions may yet remain, such as: whether particular employees voluntarily missed rest and meal breaks; why employees who worked off-the-clock did not avail themselves of the curative time-clock procedures; how much time was worked off-the-clock; whether employees worked off-the-clock with the expectation of compensation; and how much in damages employees suffered, if any. However, the mere existence of remainder issues is insufficient to defeat class certification in New Jersey, *see, e.g., Strawn, supra,* 140 *N.J.* at 67–69, 657 *A.*2d 420; *Varacallo, supra,* 332 *N.J.Super.* at 45, 752 *A.*2d 807; *Fiore, supra,* 151 *N.J.Super.* at 529, 377 *A.*2d 702, and elsewhere, *see, e.g., Sterling v. Velsicol Chem. Corp.,* 855 *F.*2d 1188, 1196–97 (6th Cir.1988) (holding that remaining questions peculiar to individual members of class do "not dictate the conclusion that a class action is impermissible"); *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 *F.*3d 177, 189–90 (4th Cir.1993) (finding predominance and certifying asbestos class action).

So too, the individualized defenses advanced by Wal–Mart do not necessarily foreclose a finding of predominance. Although "different factual situations may arise with respect to the *defenses* as to different plaintiffs[, such] does not derogate from the fact that the affirmative cause of action itself has the community of interests and of questions of law or fact which justify the class action concept." *Branch v. White,* 99 *N.J.Super.* 295, 310, 239 *A.*2d 665 (App.Div.), *certif. denied,* 51 *N.J.* 464, 242 *A.*2d 13 (1968). Our Appellate Division has stated: "[i]t is true that possibly different factual questions may come into play when the defense of waiver or other defenses are raised as against individual members

of the class. This is not a bar to maintainability of the action as a class action." *Fiore, supra,* 151 *N.J.Super.* at 529, 377 *A.*2d 702.

The arguments advanced by Wal–Mart implicate our ruling in *In re Cadillac, supra,* 93 *N.J.* 412, 461 *A.*2d 736. That case concerned a state-wide class of 7,500 purchasers of Cadillac automobiles with a specific engine. *Id.* at 419, 461 *A.*2d 736. The customers alleged that General Motors Corporation, knowing of common design defects, defrauded them into purchasing the vehicles. *Ibid.* General Motors urged decertification, arguing, as Wal–Mart does here, that individualized questions predominated over common legal and factual contentions. *Ibid.* Summarizing General Motors assertions, Justice Pollock wrote:

> GM vigorously contends that the engine is not defective and that diverse causes unrelated to the design of the V8–6–4 engine are the source of the common complaints. For example, it attributes the various problems of the individual owners to defective parts, improper maintenance, alteration of the car, or intervening accidents. GM asserts that the need to prove these numerous causes of engine failure would necessitate thousands of mini-trials involving, among others, the issues of causation and damages as to each car owner. Thus, GM contends that certification would prevent it from pursuing defenses based on each car's individual characteristics and use by each owner.
>
> [*Id.* at 422–23, 461 *A.*2d 736.]

We rejected General Motors' arguments and affirmed the class certification entered by the trial court. We explained that General Motors "misconstrue[d] the nature of class action proceedings. Certification as a class action does not limit a defendant's rights to pursue any defense on any of a plaintiff's claims . . . [C]ertification merely permits litigation of common issues on a class basis before litigation of individual issues." *Id.* at 438, 461 *A.*2d 736.

In light of the record and consistent with *In re Cadillac,* we find that plaintiffs here satisfied *Rule* 4:32–1(b)(3)'s predominance requirement. In finding that common questions predominate, however, we do not limit Wal–Mart's defenses nor diminish its procedural safeguards and rights. Rather, in defending itself, Wal–Mart may argue that employees voluntarily worked through rest or meal breaks for myriad personal reasons, may contend

that the conclusions of Baggett and Shapiro are flawed, may question the credibility of the July 2000 internal audit, and may advance any other relevant contentions. We are confident that, on remand, the trial court and parties' counsel can resolve the practical challenges presented by this litigation's individualized questions of law or fact.

## D.

Finally, in respect of predominance, we reject Wal–Mart's reliance on other state courts' decisions denying certification to similarly-pled, state-wide class-action lawsuits. Over twenty years ago, this Court observed that "different courts, even when presented with substantially similar, if not identical, claims have reached divergent conclusions in deciding whether to certify a class action." *In re Cadillac*, 93 *N.J.* at 431, 461 *A.2d* 736. That observation is no less true today, as other jurisdictions are divided on the question whether similarly-pled claims by state-wide classes of former and current Wal–Mart employees are certifiable.

In any event, we are not bound by either view. "Rather than count[ ] cases for or against class certification," *Varacallo, supra,* 332 *N.J.Super.* at 44, 752 *A.2d* 807, we are guided by our own independent examination of the facts, claims, and defenses. Our rigorous analysis satisfies us that the present appeal's common questions of law or fact predominate over individualized questions.

## V.

In addition to predominance, *Rule* 4:32–1(b)(3) requires the party seeking certification to demonstrate that class litigation is "superior to other available methods for the fair and efficient adjudication of the controversy." That requirement necessarily "implies a comparison with alternative procedures," *In re Cadillac, supra,* 93 *N.J.* at 436, 461 *A.2d* 736, and mandates assessment of "the advantages and disadvantages of using the class-action device in relation to other methods of litigation." Moore, *supra,* § 23.44. More specifically, our analysis demands

"(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method." *In re Cadillac, supra,* 93 *N.J.* at 436, 461 *A.*2d 736 (quotation omitted).

The class members' "lack of financial wherewithal" is an "important factor" in the superiority analysis. *Saldana v. City of Camden,* 252 *N.J.Super.* 188, 200, 599 *A.*2d 582 (App.Div.1991). The United States Court of Appeals for the Fifth Circuit declared that a claim's "negative value" is the "most compelling rationale for finding superiority in a class action." *Castano, supra,* 84 *F.*3d at 748. Because of the very real likelihood that class members will not bring individual actions, class actions are "often the superior form of adjudication when the claims of the individual class members are small." *Weber v. Goodman,* 9 *F.Supp.*2d 163, 170–71 (E.D.N.Y.1998).

We recognize that, in this matter, putative class members may submit their claims to the Wage Collection Division of the Department of Labor pursuant to the Wage and Hour Law, *N.J.S.A.* 34:11–56a to –56a30. However, we find that administrative structure to be an inferior forum for the adjudication of this controversy.

First, and again, the nominal value of each class members' claim counsels in favor of class litigation and against adjudication before the agency. *See Varacallo,* 332 *N.J.Super.* at 52, 752 *A.*2d 807 (rejecting disposition by Department of Banking as superior method in disputes involving small sums). Plaintiffs are hourly employees of a retail store. Independently, they lack the financial resources of their corporate adversary. The equalizing mechanism of representative litigation allows them to adequately seek redress. As the United States Supreme Court stated in *Phillips Petroleum Co. v. Shutts,* a lawsuit filed by a class of individuals with claims averaging $100, plaintiffs with small claims "would

have no realistic day in court if a class action were not available." 472 *U.S.* 797, 809, 105 *S.Ct.* 2965, 2973, 86 *L.Ed.*2d 628, 641 (1985).

Second, the administrative framework may prove arduous for the aggrieved retail employees here. The Wage Collection Division permits automatic removal to the Superior Court, *N.J.S.A.* 34:11–66, de novo review by the Superior Court, *N.J.S.A.* 34:11–63, and introduction of additional evidence on appeal without advance notice, *N.J.S.A.* 34:11–65—procedures that favor parties with greater resources and litigation experience.

Third, unitary adjudication is fair to defendant. Because Wal–Mart may defend itself against plaintiffs' allegations, its due process rights are not compromised. Moreover, through the class-action device, Wal–Mart may resolve the claims of its current and former employees across the State in an efficient manner that treats similarly-situated claimants consistently.

Finally, although not dispositive of the superiority question, claims filed in the Wage Collection Division are subject to a two-year statute of limitations, *N.J.S.A.* 34:11–56a25.1, as opposed to the six-year statute of limitations applicable to contract claims, *N.J.S.A.* 2A:14–1. That distinction may procedurally bar numerous aggrieved former Wal–Mart employees from seeking relief.

At oral argument, Wal–Mart indicated that no claims similar to those pled in this matter have been filed either in our courts or before the Department of Labor. That fact suggests that aggrieved employees may not have sought individual relief for a variety of reasons, including a lack of motivation to redress their small claims, legitimate fears concerning employer retaliation, lack of resources, or a sense of powerlessness when confronting their would-be corporate adversary.

We cannot ignore the reality that if the proposed class is not certified, thousands of aggrieved employees will not seek redress for defendant's alleged wrongdoing. *See Carnegie v. Household Int'l, Inc.,* 376 *F.*3d 656, 661 (7th Cir.2004) ("The *realistic* alternative to a class action is not ... million[s of] individual suits, but

zero individual suits."), *cert. denied*, 543 *U.S.* 1051, 125 *S.Ct.* 877, 160 *L.Ed.*2d 772 (2005). As one court proclaimed, "a negative determination may sound the death knell of the action as one for a class of persons or entities." *In re Sugar Indus. Antitrust Litig.*, 73 *F.R.D.* 322, 356 (E.D.Pa.1976). Therefore, we hold that class-wide resolution of the present controversy is superior to other available methods for its fair and efficient adjudication.

## VI.

Manageability, a "consideration [that] encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit," *Eisen v. Carlisle & Jacquelin*, 417 *U.S.* 156, 164, 94 *S.Ct.* 2140, 2146, 40 *L.Ed.*2d 732, 741 (1974), is the "most hotly contested" factor in analyzing predominance and superiority. Conte & Newberg, *supra*, § 4.32 at 269. Because of its general significance and its particular relevance to the present appeal, we address this concern separately.

▮▮▮ Denial of class status due to manageability concerns is disfavored and, "in view of the public interest involved in class actions, should be the exception rather than the rule." *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 78 *F.R.D.* 622, 628 (W.D.Wa.1978) (quotation omitted); *see also Klay v. Humana, Inc.*, 382 *F.*3d 1241, 1272–73 (11th Cir.2004) (finding manageability "will rarely, if ever, be in itself sufficient to prevent certification of a class"); *Carnegie*, *supra*, 376 *F.*3d at 661 ("[C]lass action has to be unwieldy indeed before it can be pronounced an inferior alternative ... to no litigation at all."). Complexity is an inherent trait of class litigation, and "[m]any courts have recognized ... that potential management difficulties are not grounds for class denial when justice can be done only through the class action device." Conte & Newberg, *supra*, § 4:32 at 277. In sum, "courts should be careful not to overemphasize management difficulty considerations when contrasted

with judicial economy, small claims access, and deterrence goals of the class device." *Id.* § 4:45 at 336.

■ Although we acknowledge the difficulties inherent in managing this state-wide class action, a finding of unmanageability requires more than mere difficulty in trying the case or the existence of novel challenges. *See, e.g., Buford v. H & R Block, Inc.,* 168 *F.R.D.* 340, 363 (S.D.Ga.1996), *aff'd,* 117 *F.*3d 1433 (11th Cir.1997). A court "cannot simply close its doors to ... litigants because their actions present novel and difficult questions. Instead, the court and the parties must use their ingenuity to conduct th[e] litigation in a manner which will guarantee the rights of both sides." *In re Antibiotic Antitrust Actions,* 333 *F.Supp.* 278, 289 (S.D.N.Y.1971).

■ This is not to suggest, however, that a class action may never be denied due to manageability concerns. Rather, a trial court, in the exercise of its discretion, may deny class certification when, for example, the proposed litigation creates serious difficulties with respect to notification and opt-out procedures, *see Gaffney v. United States,* 834 *F.Supp.* 1, 6 (D.D.C.1993) (denying certification because "notification and opt-out procedures are likely to be extremely difficult to manage"), or when the litigation requires the application of divergent or various governing law, *see In re Warfarin Sodium Antitrust Litig.,* 391 *F.*3d 516, 529 (3d Cir.2004) (discussing manageability problems when claims arise under substantive law of numerous states). However, such considerations must be grounded in "concrete evidence of actual or likely management problems," Moore, *supra,* § 23.46[2][e][ii], not mere speculation of complications that may arise, *see Castano, supra,* 84 *F.*3d at 744; *Windham v. Am. Brands, Inc.,* 565 *F.*2d 59, 70 (4th Cir.1977), *cert. denied,* 435 *U.S.* 968, 98 *S.Ct.* 1605, 56 *L.Ed.*2d 58 (1978).

■ Here, we are satisfied that the likely manageability obstacles of the present litigation can be overcome. Recent developments buttress our confidence in the resourcefulness, creativity,

and administrative abilities of trial courts. Specifically, as noted in Wal–Mart's 2007 Annual Report, courts in California and Pennsylvania have conducted trials—both of which resulted in jury verdicts—of similarly-pled, state-wide class actions against Wal-Mart. *Annual Report, supra,* at 54. Our trial courts are equally capable of managing such complex litigation. The alternative—declining class certification "because of vaguely-perceived management problems"—runs "counter to the policy which originally led to the [class-action] rule, . . . and also . . . discount[s] too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise." *Yaffe v. Powers,* 454 *F.*2d 1362, 1365 (1st Cir.1972), *disapproved on other grounds, Gardner v. Westinghouse Broad. Co.,* 437 *U.S.* 478, 478 n. 2, 98 *S.Ct.* 2451, 2452, 57 *L.Ed.*2d 364, 366 (1978); *accord McClendon v. Cont'l Group, Inc.,* 113 *F.R.D.* 39, 45 (D.N.J.1986). By acknowledging the flexibility of our trial courts, we adhere to the objectives of the class-action rule and find the proposed class action to be manageable.

In certifying this class, we do not restrict the trial court's ability to conduct the proposed litigation as it deems necessary. As a general principle, trial courts are imbued with significant discretion with which "to solve the novel administrative problems posed in a class action." *Manual for Complex Litigation* § 1.43 at 37 (1982). "Courts have developed several innovative management techniques to eliminate or minimize court burdens arising from management difficulties posed by class actions." Conte & Newberg, *supra,* § 4:32 at 288–89 (discussing strategies and collecting cases).

Our courts are also empowered to craft remedies and procedures to address the peculiar problems of class litigation. For example, trial courts may alter or amend the certification of a class, *R.* 4:32–2(a); *see also In re Cadillac, supra,* 93 *N.J.* at 437, 461 *A.*2d 736 (noting trial court's authority to decertify class), may subdivide classes or maintain class status with respect to only particular issues, *R.* 4:32–2(d), may prescribe measures to prevent undue repetition of evidence or complication of the proceedings,

and may issue "appropriate orders" to deal with procedural matters, *R.* 4:32–3.

We are confident that the Law Division will properly employ its broad, equitable authority and sound discretion to manage the instant litigation and appropriately address the important concerns of both parties in respect of the permissible uses of statistical extrapolation, evidentiary redundancy, and any other procedural, administrative, and evidentiary issues that may arise. We are guided by the observation that "[e]xperience ... shows that visions of unmanageability soon disappear, because courts, together with counsel, have been able to manage litigation of constantly increasing complexity and magnitude." *In re Sugar Indus. Antitrust Litig., supra,* 73 *F.R.D.* at 357.

## VII.

"When the organization of a modern society, such as ours, affords the possibility of illegal behavior accompanied by widespread, diffuse consequences, some procedural means must exist to remedy—or at least to deter—that conduct." *Eisen, supra,* 417 *U.S.* at 186 n. 8, 94 *S.Ct.* at 2156, 40 *L.Ed.*2d at 753 (Douglas, J., concurring). Here, the class action is just such a procedural device. By equalizing adversaries, we provide access to the courts for small claimants. By denying shelter to an alleged wrongdoing defendant, we deter similar transgressions against an otherwise vulnerable class—72,000 hourly-paid retail workers purportedly harmed by their corporate employer's uniform misconduct. Individually, the aggrieved Wal–Mart employees lack the strength in terms of resources and motivation to assert their grievances in court. Collectively, as a class, they are able to pursue their claims. If our courts can fairly manage complex litigation brought by Cadillac owners, and vigorously defended on individualized grounds by a corporate adversary, then it follows that our courts also can fairly manage the present class action.

Accordingly, we hold that common questions of law and fact predominate over any individualized questions, that the class-

action vehicle is superior to other methods of adjudication for the modest claims alleged, and that the trial court's manageability misgivings can be overcome. We therefore conclude that the Law Division abused its discretion in declining to certify the putative class action. In finding the proposed class certifiable, we express no opinion on the merits of plaintiffs' claims or Wal–Mart's defenses.

We reverse the judgment of the Appellate Division and remand the matter for entry of an order certifying the class.

Justice RIVERA–SOTO, dissenting.

In a thoughtful, detailed and well-reasoned memorandum decision, Judge Ann McCormick denied plaintiffs' motion for class certification because they "failed to satisfy either the predominance or the superiority requirements" of *Rule* 4:32–1(b)(3). In respect of the predominance requirement, the trial judge reasoned that "the factor which presents the impediment to certification of a class in this case is predominance in terms of the manageability of the proposed class." Citing to *In re Cadillac V8–6–4 Class Action,* 93 *N.J.* 412, 431, 461 *A.*2d 736 (1983), the trial judge noted that "[p]redominance may be found when there exists a 'common nucleus of operative facts.' " She explained further that

[s]uch a nucleus can generally be found when the potential class, including absent class members, seeks to remedy a common legal grievance. In a predominance inquiry, the focus is whether the proposed classes are sufficiently cohesive to warrant adjudication by representation. The more cohesive the class, the greater the likelihood that absent members can fairly be bound by the decisions on the class representatives' claims. Although the commonality requirement may be satisfied by a single shared experience, the predominance inquiry is far more demanding.

[(citations and internal quotation marks omitted).]

The trial judge found that "[t]here are 40 Wal–Mart stores and nine Sam's Club stores in New Jersey" and that, "[i]n the Wal–Mart stores, there are 90 different hourly employee classifications while, in the Sam's Club stores, there are 100 different hourly employee classifications." Taking issue with the obviously erroneous statistical and anecdotal proofs advanced by plaintiffs, she

explained that those proofs do "not resolve, however, whether Wal–Mart violated its break policy as to each individual employee or whether the missed break was due to some other reason." Concluding that plaintiffs had failed to demonstrate that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual class members," *Rule* 4:32–1(b)(3), the trial judge highlighted that "[t]he class action mechanism is not meant to eliminate the requirement of injury to the individual class members" and that "[e]ven if all of [p]laintiffs' factual and legal arguments were to be accepted, their own statistical analyses show that a not insubstantial number of class members have not been injured."

In respect of the superiority requirement, the trial judge explained that *Rule* 4:32–1(b)(3) also requires that the proponents of a class action must also demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." She reasoned that

> [t]he superiority determination turns on an informed consideration by the court of three factors: (1) the alternative methods of adjudication available for each issue; (2) a comparison of fairness to each member whose interests may be involved with respect to each of the adjudicative methods that may be applied; and (3) a comparison of the efficiencies to be made by application of one adjudicative method over another.
>
> [(citing *In re Cadillac V8–6–4 Class Action, supra*, 93 *N.J.* at 436, 461 *A*.2d 736).]

She explained that "when the trial of a claim would involve identical proofs regarding defendant's conduct, and the claim may be prohibitively expensive for an individual to pursue, class action emerges as the superior method of adjudication[,]" adding that "[u]nder such circumstances, individual actions or test cases become an inferior alternative to the class action because ... the economics of the situation ... make it impossible for aggrieved persons to vindicate their rights by separate actions." (citation omitted).

In the end, the trial judge concluded that pursuing this case as a class action was not a superior form for resolving the disputes at issue, noting that "[i]n this case, however, there is an alternative mechanism that each class member could have pursued." She

explained that "[e]mployees have the right to submit a claim with the Wage Collection Division of the Department of Labor under the New Jersey Wage and Hour Law" and that "[t]his is a virtually cost free and efficient remedy for any employee who believes that he or she is aggrieved." (citations omitted).

The Appellate Division affirmed. It too concluded that plaintiffs' claims failed to satisfy the predominance requirement of *Rule* 4:32–1(b)(3). *Iliadis v. Wal–Mart Stores, Inc.,* 387 *N.J.Super.* 405, 904 *A.*2d 736 (App.Div.2006). Repeating the concerns expressed by the trial judge, the Appellate Division took issue with the quality of plaintiffs' proofs, concluding that "the expert reports submitted by plaintiffs fail to resolve the individual issues of liability. They fail to account for variability in employee conduct and incorrectly assume that a missed punch is equivalent to a missed break." *Id.* at 419, 904 *A.*2d 736. Properly acknowledging that, "[i]n reviewing a trial court order granting or denying class certification, we are charged with determining whether the trial court abused its discretion[,]" the panel explained it was "unable to conclude that the trial court's order represents an abuse of discretion[.]" *Id.* at 422, 904 *A.*2d 736.

There simply is nothing in the majority's analysis that supports its conclusion that the trial judge abused her discretion in denying class action status to these plaintiffs. What the majority does do—and movingly so—is emote why, if it were a court of first instance, a case could be made for class action certification under the facts presented. However, the majority's disagreement with the trial judge's determination—as affirmed by the Appellate Division—simply does not and cannot rise to the level of an abuse of discretion.

"Class certification decisions rest in the sound discretion of the trial court." *Muise v. GPU, Inc.,* 371 *N.J.Super.* 13, 31, 851 *A.*2d 799 (App.Div.2004). For that fundamental reason, it is clear that "[a]lthough the ordinary 'abuse of discretion' standard defies precise definition, it arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" *Flagg v. Essex*

*County Prosecutor,* 171 *N.J.* 561, 571, 796 *A.*2d 182 (2002) (quoting *Achacoso–Sanchez v. Immigration and Naturalization Service,* 779 *F.*2d 1260, 1265 (7th Cir.1985)).

Nothing in the majority's analysis can lead to the conclusion that the trial judge's decision was "'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" *Ibid.; see also In re Senior Appeals Examiners,* 60 *N.J.* 356, 365, 290 *A.*2d 129 (1972) (explaining that determination would be "an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis" (citation and internal quotation marks omitted)). On the contrary, any fair reading of the trial judge's decision denying class certification can only conclude that it was rationally explained; that the trial judge explored all of the arguments advanced by the parties, applied all relevant precedent, and rationally concluded that class action certification was inappropriate under the circumstances; that the trial judge did not "inexplicably depart[ ] from established policies;" that she explained the reasoning behind her decision; that she noted that "[a]t least seven other courts also have denied class action certification in similar lawsuits against Wal–Mart based on the failure to satisfy the predominance criteria" (footnote omitted) and that her analysis simply did not "rest[ ] on an impermissible basis." That necessary analysis is absent from the majority's opinion.

In the final analysis, I entirely agree with the reasoning and conclusions expressed by the trial judge and affirmed by the Appellate Division. Even if I did not so conclude, I nevertheless cannot find in this record a basis—any basis—to support the majority's conclusion that the trial judge abused her discretion when she denied plaintiffs' class certification application. For those reasons, I respectfully dissent.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LaVECCHIA, ALBIN, WALLACE and HOENS—5.

*For affirmance*—Justice RIVERA–SOTO—1.