**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2836-16T1

JOSEPH ARDINO, SAMANTHA
ARDINO, KRISTA A. DEFAZIO,
SCOTT RICHTER, JAMES HEANEY,
and PHILLIP MAZZUCCO, on behalf
of themselves and all others similarly
situated,

      Plaintiffs-Respondents,

v.

RETROFITNESS, LLC, ABC
FINANCIAL SERVICES COMPANY,
INC., Z TIMES THREE, LLC, d/b/a
RETROFITNESS OF KENILWORTH,
BRITCARIANNA, LLC, d/b/a
RETROFITNESS-FAIRFIELD, PJ'S
FITNESS EXPRESS, INC., d/b/a
RETROFITNESS OF BORDENTOWN,
and PRJ HOLDINGS, LLC, d/b/a
RETROFITNESS OF WALL,

      Defendants-Appellants.

_____

Argued February 14, 2018 – Decided May 21, 2019

Before Judges Alvarez, Nugent and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0362-14.

Justin M. Klein argued the cause for appellant Retrofitness, LLC (Marks & Klein, LLP, attorneys; Justin M. Klein and Steven T. Keppler, on the joint briefs).

Jonathan A. Cass argued the cause for appellant ABC Financial Services, Inc. (Cohen Seglias Pallas Greenhall and Furman PC, attorneys; Jonathan A. Cass, on the joint briefs).

Joshua S. Bauchner argued the cause for appellants Z Times Three, LLC, Britcarianna, LLC, PJ's Fitness Express, Inc., and PRJ Holdings, LLC (Ansell Grimm & Aaron PC, attorneys; Joshua S. Bauchner and Michael H. Ansell, on the joint briefs).

Andrew R. Wolf argued the cause for respondents (Jones Wolf & Kapasi, LLC, Poulos LoPiccolo PC, and The Wolf Law Firm LLC, attorneys; Joseph K. Jones, Benjamin J. Wolf, John Poulos, Joseph LoPiccolo, Andrew R. Wolf, Henry P. Wolfe, and Matthew S. Oorbeek, on the briefs).

PER CURIAM

This class action involves plaintiffs' claims that their contracts with certain fitness facilities violate four consumer laws. A Law Division judge certified a general class and two subclasses. On leave granted, defendants filed this appeal. Having considered the substantive law concerning plaintiffs' underlying claims, and having undertaken a qualitative assessment of the common and individual questions presented by those claims, we conclude plaintiffs have established the elements necessary for class certification for

2

some, but not all claims. Accordingly, we vacate the parts of the order granting plaintiffs' motion for class certification as to the general class and the class designated as Subclass #1. We affirm the part of the order granting plaintiff's motion for the class designated as Subclass #2, namely, members charged fees after attempting to cancel their memberships. We remand the matter to the trial court for further proceedings.

## I.

## A.

The parties are a fitness facility franchisor, a finance company, four franchisees, and individuals who signed health club services contracts ("Membership Agreements") with the franchisees. Defendant Retrofitness, LLC ("Retrofitness") "licenses the use of its federally registered trademark to franchisees who, in turn, independently own and operate . . . fitness facilities." Defendant ABC Financial Services Company, Inc. ("ABC") provides billing services to all New Jersey Retrofitness franchisees. Defendants Z Times Three, LLC d/b/a Retrofitness of Kenilworth ("ZX3"), Britcarianna, LLC d/b/a Retrofitness-Fairfield ("Britcarianna"), PJ's Fitness Express, Inc. d/b/a Retrofitness of Bordentown ("PJ's"), and PRJ Holdings, d/b/a Retrofitness of Wall ("PRJ"), (collectively, "the Clubs") are Retrofitness franchisees. Plaintiffs,

Joseph Ardino, Samantha Ardino, Krista A. DeFazio, Scott Richter, James Heaney, and Phillip Mazzucco each signed one of the Clubs' Membership Agreements.

Plaintiffs' complaint alleges the language in the Membership Agreements was "prepared, drafted, dictated and/or controlled by R[etrofitness], either directly and/or through ABC." Plaintiffs allege ABC "handled all aspects of billing, including the cancellation process, for all Retrofitness health club franchises located in the State of New Jersey." They also allege the Membership Agreements plaintiffs and others signed, as well as certain fees the Clubs charged plaintiffs and those similarly situated, violated four consumer laws: the Retail Installment Sales Act ("RISA"), N.J.S.A. 17:16C-1 to -61, Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14 to -18, Health Club Services Act ("HCSA"), N.J.S.A. 56:8-39 to -48, and Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -210.

Plaintiffs' Membership Agreements, which are attached to the complaint, are, for the most part, printed adhesion contracts, all containing similar language. The agreements authorize the Clubs to either debit a member's credit card account or make an electronic funds transfer (EFT) from a member's bank account to pay monthly dues and other fees. If payment is made by EFT, the

4

Membership Agreements reserve for ABC "the right to draft via EFT all amounts owed by the member including any and all late fees and service fees. Subject to appropriate State and Federal Law." (The "First Subject To Law Provision)."

The Membership Agreements contain an optional "Automatic Renewal Program (Monthly Dues Members)." The stated terms are, among others, if a member is not in default, and subject to the agreement's remaining terms, "the membership will automatically renew for the rate indicated below. Renewal terms may be cancelled at any time provided a 60-day written notice is sent by certified mail to the club's address." The Automatic Renewal Program terms also state the monthly renewal rate will not be increased above a specified amount, $19.99.

In addition, each club charges an annual "rate guarantee fee," in an amount specified in the contract, collectible on August 1 or December 1. The Membership Agreements state that "subject to applicable law, Member agrees that ABC . . . may contact member at any mailing address, phone number or email address set forth on the face of this agreement, or any other address subsequently provided in, or obtained by, ABC[]" (the "Second Subject to Law Provision").

A-2836-16T1

The Membership Agreements, in column format, specify the beginning and renewal rate for the membership; the "Enrollment Fee or Prepaid Amount"; the remaining balance, for example, $19.99 a month for eleven months totaling $219.89 plus tax; and the total of the enrollment fee and remaining balance. Some agreements include a processing fee. The agreements do not, as required by the HCSA, "state that a bond, irrevocable letter of credit or securities, monies or other security is filed or deposited with the Director of the Division of Consumer Affairs to protect customers who are damaged or suffer any loss by reason of breach of contract or bankruptcy." (The "Bond Clause").

The Membership Agreements include three clauses that contain language identical or substantially similar to the following, which are in the ZX3 Membership Agreement:

> You understand that, except as herein provided, my membership is absolutely non-cancelable. Your failure to regularly attend and utilize the facility does not relieve you of your obligations, regardless of the circumstances, to pay the balance owed. Should you default upon this agreement, you agree to pay all costs of collection, including but not limited to collection agency fees of up to 50% of the unpaid balance, court costs, disbursements and attorney's fees which may be paid or incurred by the facility. There is absolutely no refunds/reimbursements for prepaid membership dues. (The "Non-cancellation Clause").
>
> . . . .

A-2836-16T1

DEFAULT AND LATE PAYMENTS: Should you default on any payment obligation as called for in this agreement, the club will have the right to declare the entire remaining balance due and payable and you agree to pay the allowable interest, and all costs of collection including but not limited to collection agency fees, court costs, and attorney fees. A default occurs when any payment due under this agreement is more than ten days later. Should any monthly payment become more than ten days past due, you will be charged a late fee. An additional service fee will be assessed for any check, draft, credit card, or order returned for insufficient funds or any other reason. If the Member is paying monthly dues by electric funds transfer (EFT), the club's billing company, ABC Financial Services, Inc., reserves the right to draft via EFT all amounts owed by the member including any and all late fees and service fees. Subject to appropriate State and Federal Law. NOTE: Members paying monthly dues by E.F.T. are subject to $10.00 per month increase of monthly dues if E.F.T. payment is stopped or changed. This will not affect any other provisions of this agreement. (The "Default Clause").

. . . .

If any clause or provision herein shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision, which shall remain in full force and effect. The contract shall be governed by laws of the [S]tate of New Jersey. The Superior Court of the State of New Jersey shall have jurisdiction over any dispute which arises under this agreement, and you submit and hereby consent to such court's exercise of jurisdiction. In any successful action by the facility to enforce this contract, the facility shall be entitled to recover its attorney's fees

A-2836-16T1

and expenses incurred in such action.  (The "Venue Clause").

Plaintiffs Ardino signed a Membership Agreement with ZX3.  Plaintiff DeFazio signed an agreement with Britcarianna, Richter with PJ's, and Heaney and Mazzucco with PRJ.  For these agreements, the monthly installment payment was $19.99, but additional fees varied with each membership.  ZX3 charged an annual rate guarantee fee of $29.  Britcarianna charged a processing fee of $19.99 and an annual rate guarantee fee of $39.  PJ's charged a processing fee of $29.99 and an annual rate guarantee fee of $29.  PRJ charged plaintiff Heaney an enrollment fee of $99, a processing fee of $29, and an annual rate guarantee fee of $39.  PRJ charged plaintiff Mazzucco an enrollment fee of $17, a processing fee of $29, and an annual rate guarantee fee of $29.

The complaint proposed a class defined as:

> All persons who, at any time on or after the day six (6) years prior to the day on [which] the original [c]omplaint was filed, enrolled in a health club membership at and/or for use at any Retro[f]itness health club located in New Jersey, where the [m]embership [a]greement used to enroll that person contained terms the same or similar to the [m]embership [a]greements used in the transactions with the named [p]laintiffs.

The complaint also proposed two subclasses. Subclass #1 includes "[a]ll members of the Class who paid an annual rate guarantee fee or similar charge."

8

Subclass #2 includes "[a]ll members of the Class who cancelled or attempted to cancel their Membership Agreement, and who were charged additional monthly payments and/or an annual rate guarantee fee after the cancellation date."

The complaint includes three counts. The first count alleges the Membership Agreements with plaintiffs and those similarly situated contain terms that violate the TCCWNA, both directly and indirectly. Plaintiffs allege the Membership Agreements violate the TCCWNA directly because their First and Second Subject to Law Provisions do not "specify[] which provisions are or are not void, unenforceable, or inapplicable in New Jersey." Plaintiffs allege the Membership Agreements violate the TCCWNA indirectly by violating clearly established rights under the RISA, HCSA, and CFA.

Plaintiffs first allege the Default Clause violates the RISA by accelerating the entire balance due upon default or late payment, by charging additional fees if a credit card payment or EFT is "stopped or changed," and by charging fees not authorized by the RISA.

Plaintiffs next allege the Membership Agreements violate five consumer rights clearly established by the HCSA. First, the agreements, through the Automatic Renewal Program, "obligate [p]laintiffs and all other similarly situated . . . for more than three (3) years from the date the [m]embership

9

[a]greements are signed by the buyers." Second, the Membership Agreements obligate plaintiffs and all others similarly situated to renew their health services contracts. Third, the Membership Agreements state they are "absolutely non-cancelable." Fourth, the agreements do not specifically set forth in a conspicuous manner on the first page the buyer's total payment obligation. Last, the Membership Agreements fail to state that a bond, irrevocable letter of credit or securities, monies or other security was filed or deposited with the Director of the Division of Consumer Affairs to prevent customers who are damaged or suffered any loss by reason of breach of contract or bankruptcy.

Plaintiffs finally allege in the complaint's first count the Membership Agreements violate the CFA. According to plaintiffs, the Membership Agreements violate the CFA by violating the HCSA and by implementing the following five unconscionable commercial practices: imposing unduly onerous cancellation policies for the sole purpose of impeding cancellations, thus causing the patrons to pay for unwanted services; failing to set forth the total payment obligations on the first page of the Membership Agreements; omitting to include fees such as the enrollment and annual rate guarantee fees in the member's total payment obligation; failing to state whether such fees are

included in the total Membership Agreements; and stating that the Membership Agreements are "absolutely non-cancelable."

The second count, which concerns Subclass #1 members only, alleges the Membership Agreements violate the RISA and CFA by charging an annual rate guarantee fee, which is not specifically permitted by the RISA. This violation of the RISA, according to count two, is a deceptive business practice that violates the CFA.

The complaint's third count concerns Subclass #2 members only. This count alleges the Membership Agreements violate the HCSA by obligating customers to automatically and perpetually renew their contracts through the use of unreasonable and unduly onerous cancellation requirements. Because a violation of the HCSA constitutes an unlawful practice that is a per se violation of the CFA, the third count also alleges defendants violate the CFA. In addition, the third count alleges defendants violated the CFA by charging plaintiff Richter and those similarly situated either monthly membership fees or an annual rate guarantee fee after receiving a cancellation request.

In addition to injunctive relief, plaintiffs sought the following: maximum statutory damages under the TCCWNA, which provides for civil penalties of "not less than $100.00," N.J.S.A. 56:12-17; treble damages under the CFA,

11

N.J.S.A. 56:8-19; and attorneys' fees and costs pursuant to the TCCWNA and CFA. N.J.S.A. 56:8-19; N.J.S.A. 56:12-17.

Defendants filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted. The trial court denied the motion. Defendants ZX3, Britcarianna, and PJ's moved for reconsideration and the court denied that motion. Defendants did not move for leave to appeal either of the memorializing orders.

Following the denial of these motions, the court stayed discovery pending mediation. In response to plaintiffs' mediation discovery requests, defendants identified 381,053 members of the class, 150,569 individuals who met the definition of Subclass #1 and had paid 495,912 annual rate lock fees totaling $15,626,372, and 70,989 people who met the definition of Subclass #2 and had paid approximately $2,054,751 in post-cancellation fees.

When mediation proved unsuccessful, the court fixed deadlines for plaintiffs to answer interrogatories, respond to document demands, and appear for depositions. Plaintiffs filed their motion for class certification before the deadlines for them to answer discovery, so the court adjourned the motion's return date until after the discovery deadlines. On the new return date, some

plaintiffs remained delinquent in their discovery obligations, but the court heard argument notwithstanding the delinquency.

B.

The trial court filed an order and written opinion granting plaintiffs' motion to certify the class and two subclasses. The court rejected defendants' argument that the motion for class certification was premature and violated their right to due process because discovery was not yet complete. It also rejected defendants' argument that certifying the class would result in thousands of mini-trials because the Membership Agreements were not identical and may "contain different provisions than the form provided by Retro[f]itness . . . to its franchisees." The court found those concerns to be unsubstantiated because "the statistics provided to the [c]ourt [had] already isolated the total number of prospective plaintiffs with the same, or similar, contract provisions at issue."

Turning to the requirements of Rule 4:32-1(a), the court found that the proposed class was sufficiently numerous and that plaintiffs had "provided a number of points of commonality related to the contracts and business practices utilized by Retro[f]itness and its affiliates." Further, the claims of the named plaintiffs were typical of the prospective class members because "they ar[o]se from the same factual circumstances, the written membership agreements and

business practices of [d]efendants, and [were] being pursued through identical statutes and causes of action under the TCCWNA, HCSA, RISA and CFA." The court also found that counsel and the proposed class representatives could adequately represent the class, as counsel had extensive prior experience in consumer class action litigation and the named plaintiffs had "no interests antagonistic to those of the class."

In considering the requirements of Rule 4:32-1(b)(3), the court rejected defendants' argument that its "rigorous analysis" must extend to the merits of plaintiffs' complaint. It found that "questions of law and fact common to the members of the class predominate[d] over any questions affecting only individual members," noting that "[p]laintiffs' complaint ar[ose] from membership agreements identical or similar to th[ose] of all proposed class members on identical issues of New Jersey [l]aw." It further found that no individual issues had been raised that would "frustrate a fair, efficient, and proper adjudication on the predominant issues arising from the membership agreement shared by all [p]laintiffs."

The court also found that a class action was superior to other methods of adjudicating the controversy because litigating individual claims for 381,053 potential plaintiffs relating to "common questions of fact and law would be

14

inefficient and unduly burdensome" and because the dollar amount of individual claims was "small enough to dissuade any one rational plaintiff from undertaking . . . litigation" thereby precluding "most, if not all, class members . . . from exercising their causes of action." The court recognized defendants' concern that their reputation would be irreparably damaged if a class action notice was sent to the proposed class members but found that "[a]ny litigation bears the risk of reputational harm," and that "as a matter of public policy it would be untoward for [it] to prevent certification of non-frivolous claims on the grounds that a potentially liable party [would] suffer harm."

Finally, the court found that the class action would be manageable because there were "no related cases pending elsewhere and the large size and lack of relative complexity len[t] itself to the class action format." It concluded that there was "no evidence that a class action would require the parties to conduct many separate 'mini-trials' to deal with each individual's factual circumstances because . . . [p]laintiffs[] all . . . entered into similar/identical membership agreements with [d]efendants and now [sought] to assert causes of action on the terms provided in the contract[s]."

II.

A.

On appeal, defendants note that several named plaintiffs have unsuccessfully brought other "nearly identical" claims against Retrofitness and some of its other franchisees, and plaintiffs' attorneys have unsuccessfully brought nearly identical claims against different fitness companies. Defendants attack the trial court's finding of nearly every class action requirement. They argue the trial court did not engage in a "rigorous analysis" of the claims, defenses, relevant facts, and applicable substantive law; erred by finding that plaintiffs are typical of the proposed class; and erred by finding plaintiffs were adequate to serve as class representatives. They also argue plaintiffs' claims fail to present any questions of fact or law, and, in any event, any questions of fact or law affecting individual members of the putative class predominate over purported questions common to all putative class members.

B.

Plaintiffs respond that the "rigorous analysis" a court must undertake when considering whether to certify a class neither mandates nor permits a general inquiry into the substantive merits of the underlying claims, as defendants argue. Plaintiffs contend they have satisfied the "typicality"

requirement because their claims and those of the class share the same essential characteristics, and they are adequate to serve as class representatives because they have substantial conflicts of interest with class members. They characterize defendants' argument that no common questions of law or fact exist as a "transparent and improper attempt to obtain review of issues not relevant to and not decided in the class certification order and opinion on appeal."

Plaintiffs assert defendants' challenge to the trial court's "predominance findings" overlook "that the individual questions raised by the class and subclass claims can be readily resolved through [d]efendants' business records, and therefore do not predominate over the fundamental common questions, such as whether the Membership Agreements and fees are subject to and violate the TCCWNA, CFA, and RISA."

III.

A.

The requirements for maintaining a class action are found in Rule 4:32-1, which provides in pertinent part:

> (a) General Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the

A-2836-16T1

representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability in concentrating the litigation of the claims in the particular forum; and

(D) the difficulties likely to be encountered in the management of a class action.

The four requirements of subpart (a) are often referred to as "numerosity, commonality, typicality, and adequacy of representation." Lee v. Carter-Reed Co., 203 N.J. 496, 519 (2010). The numerosity requirement is satisfied when a

class "is sufficiently numerous so that joinder is not a satisfactory alternative." In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 425 (1983). A single common question may establish commonality. See Delgozzo v. Kenny, 266 N.J. Super. 169, 185 (App. Div. 1993).

To satisfy the typicality requirement, "[t]he claims of the representatives must 'have the essential characteristics common to the claims of the class.'" In re Cadillac, 93 N.J. at 425 (quoting 3B James W. Moore et al., Moore's Federal Practice §23.06-2 (2d ed. 1982)). The claims of the representatives need not be identical to those of the class members. Laufer v. U.S. Life Ins. Co., 385 N.J. Super. 172, 180 (App. Div. 2006). "If the class representative's claims arise from the same events, practice, or conduct, and are based on the same legal theory, as those of other class members, the typicality requirement is satisfied." Id. at 180-81 (quoting 5 James W. Moore et al., Moore's Federal Practice §23.24[2] (3d ed. 1997)).

When considering "whether the putative class representative will be able to 'fairly and adequately protect the interests of the class [,]' . . . 'courts consider the adequacy of both the named representative and class counsel.'" Id. at 181 (quoting Moore, §23.25[3][a]). "To satisfy this requirement, 'the plaintiff must

not have interests antagonistic to those of the class.'" Id. at 182 (quoting Delgozzo, 266 N.J. Super. at 188).

If a court concludes a plaintiff has satisfied the four prerequisites to a class action – numerosity, commonality, typicality, and adequacy of representation – the court must then consider the criteria set forth in Rule 4:32-1(b). "To determine predominance under Rule 4:32-1(b)(3), the court decides 'whether the proposed class is sufficiently cohesive to warrant adjudication by representation.'" Dugan v. TGI Fridays, Inc., 231 N.J. 24, 48 (2017) (citations omitted). Cohesion does not require that there be no individual issues, that resolution of common issues will resolve the entire dispute, or that class members be affected in exactly the same way. Ibid.

Nonetheless, "[t]he predominance factor . . . is far more demanding than Rule 4:32–1(a)(2)'s requirement that there be questions of law or fact common to the class." Ibid. (citations omitted). When considering the question of predominance, a court "should conduct a 'pragmatic assessment' of various factors." Lee, 203 N.J. at 519 (citing Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 108, (2007)). Such an evaluation includes "a qualitative assessment of the common and individual questions rather than a mere mathematical quantification of whether there are more of one than the other." Id. at 519-20

(citing Iliadis, 191 N.J. at 108). That is because "the answer to the issue of predominance is found . . . in a close analysis of the facts and law." Iliadis, 191 N.J. at 109 (alteration in original) (quoting Cadillac, 93 N.J. at 434).

Rule 4:32-1(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In making that inquiry, a court "must undertake '(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class-action, and (3) a comparison of the efficiency of adjudication of each method.'" Dugan, 231 N.J. at 49 (quoting Iliadis, 191 N.J. at 114-115).

"In making the predominance and superiority assessments, a certifying court must undertake a 'rigorous analysis' to determine if the Rule's requirements have been satisfied." Iliadis, 191 N.J. at 106-107 (quoting Carroll v. Cellco P'ship, 313 N.J. Super. 488, 495 (App. Div. 1998)).

### B.

In their threshold argument, defendants assert the trial court failed to engage in a "rigorous analysis" of the claims, defenses, relevant facts, and applicable substantive law. They argue the trial court "wholly rejected this

21

[c]ourt's instruction [in <u>Carroll</u>, 313 N.J. Super. at 495] that it engage in a 'rigorous analysis' of both the <u>Rule</u> 4:32 elements and the 'merits' of [p]laintiffs' claims."

Plaintiffs respond that the trial court's opinion granting class certification was "more than sufficiently 'rigorous' in its analysis of the [<u>Rule</u>] 4:32-1 requirements."  Plaintiffs note "the relatively straightforward nature of [their] claims, . . . which involve statutory causes of action that do not require proof of scienter or reliance, and assert violations and unlawful fees imposed in form contracts."  Plaintiffs assert defendants' arguments have "nothing to do with the 'rigor' of the court's findings and rulings and the class certification requirements, but rather reflect[] the [d]efendants' dissatisfaction with the trial court's denial almost two years earlier of their motions to dismiss the [p]laintiffs' claims for insufficient legal merit and their motion for reconsideration."

Defendants' threshold argument – that the trial court "wholly rejected" undertaking a rigorous analysis – is based on their misapplication of legal principles to a misstatement of the trial court's remarks.  And there is some merit to plaintiffs' rejoinder.  But the competing contentions bring into focus the interplay between the "rigorous analysis" requirement concerning class certification and the legal sufficiency of the underlying claims.

As stated in Carroll, "[a]lthough class certification should not be denied based on the merits of a complaint, some preliminary analysis is required." 313 N.J. Super. at 495. That is so because "a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Ibid. (quoting Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996)).

Thus, though courts considering a motion for class certification "liberally indulge the allegations of the complaint," Daniels v. Hollister Co., 440 N.J. Super. 359, 363 (App. Div. 2015), and view "the remaining pleadings, discovery (including interrogatory answers, relevant documents, and depositions), and any other pertinent evidence in a light favorable to plaintiff," Dugan, 231 N.J. at 49 (quoting Lee, 203 N.J. at 505), such deference "does not apply to a plaintiff's assertion that a given case is appropriate for class certification." Ibid. "To the contrary, a court deciding class certification 'must undertake a rigorous analysis' to determine if the Rule's requirements have been satisfied." Ibid. (citations omitted). A class should not be certified if it is clearly infeasible. See Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 225 (1972). A contrary result would undermine the policy considerations underpinning class actions, such as "judicial economy, cost-effectiveness, convenience, consistent treatment of

class members, protection of defendants from inconsistent obligations, and allocation of litigation costs among numerous, similarly-situated litigants." Dugan, 231 N.J. at 46.

IV.

With the foregoing principles in mind, we turn to our task of ascertaining whether the trial court has followed the class action standards set forth in Rule 4:32-1. Dugan, 231 N.J. at 50-51. "As an initial step in that inquiry, we review the substantive law that governs the plaintiffs' . . . claims." Id. at 50.

A.

We begin with plaintiffs' RISA claims. Following defendants' filing of this appeal, the Appellate Division held that the RISA does not apply to health club Membership Agreements. Mellet v. Aquasid, LLC, 452 N.J. Super. 23, 30 (App. Div. 2017). In Mellet, the court explained that such health club Membership Agreements are dissimilar to security agreements, chattel mortgages, conditional sales contracts, or other similar instruments enumerated in RISA. Ibid. In addition, the court explained that "[h]ealth club members are not in the category of consumers RISA is designed to protect, because these contracts do not involve the sale of goods." Ibid.

In view of the holding in <u>Mellet</u>, none of the purported class members in this action can state a claim under the RISA. Consequently, plaintiffs cannot satisfy the requirements of <u>Rule</u> 4:32-1. They cannot, for example, satisfy the typicality and numerosity requirements of their alleged RISA claims when neither they nor the proposed class members have RISA claims.

For these reasons, the allegations in the complaint's first count that allege violations of the RISA, and therefore the TCCWNA, are infeasible and cannot be certified as class action claims. For the same reasons, Subclass #1, which is the subject of the complaint's second count and which is based on purported violations of RISA, cannot continue as a certified class.

## B.

We reach the same conclusion concerning what plaintiffs label in the complaint's first count as their "direct" TCCWNA claim. The TCCWNA provides that "[n]o consumer contract, notice or sign shall state that any of its provisions is or may be void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, enforceable, or inapplicable within the State of New Jersey; provided, however, that this shall not apply to warranties." N.J.S.A. 56:12-16. The TCCWNA further provides that "[a]ny person who violates the provisions of this act shall be liable to the

A-2836-16T1

aggrieved consumer for a civil penalty of not less than $100 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs." N.J.S.A. 56:12-17.

In their complaint, plaintiffs contend the First and Second Subject to Law Provisions in the Membership Agreements violate N.J.S.A. 56:12-16, thus entitling each class member to $100 in damages under N.J.S.A. 56:12-17. Defendants argue that the language of N.J.S.A. 56:12-16 is plainly and clearly intended to protect consumers from contracts employed nationally, in multiple jurisdictions. They further contend the statutory language, by its terms, has no application to contracts used exclusively in the State of New Jersey.

We need not decide this issue, however, because the Supreme Court has held that the term "aggrieved consumer" as used in N.J.S.A. 56:12-7 "denotes a consumer who has suffered some form of harm as a result of defendant's conduct." Spade v. Select Comfort Corp., 232 N.J. 504, 522 (2018). Although the consumer need not suffer an "injury compensable by monetary damages" to be aggrieved under the TCCWNA, the consumer must have suffered some harm. Id. at 523. No plaintiff has alleged he or she has suffered harm as a consequence of the First and Second Subject to Law Provisions in the Membership

Agreements. Consequently, plaintiffs cannot establish typicality, numerosity, or any class action criteria.

The TCCWNA also prohibits a "seller, lessor, creditor, lender or bailee" from offering, entering into a consumer contract, or displaying "any written consumer warranty, notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." N.J.S.A. 56:12-15. Plaintiffs contend the Membership Agreements violate TCCWNA by violating plaintiffs' clearly established consumer rights under the HCSA and CFA. We thus turn our attention to the substantive law that governs plaintiffs' claims under those acts.

C.

The HCSA provides in N.J.S.A. 56:8-42:

> b. A health club services contract shall specifically set forth in a conspicuous manner on the first page of the contract the buyer's total payment obligation for health club services to be received pursuant to the contract.
>
> c. A health club services contract of a health club facility which maintains a bond, irrevocable letter of credit or securities, moneys or other security pursuant to subsection a. of section 3 of this act shall set forth that a bond, irrevocable letter of credit or securities,

moneys or other security is filed or deposited with the Director of the Division of Consumer Affairs to protect buyers of these contracts who are damaged or suffer any loss by reason of breach of contract or bankruptcy by the seller.

d. Services to be rendered to the buyer under the contract shall not obligate the buyer for more than three years from the date the contract is signed by the buyer.

. . . .

i. A health club services contract shall not obligate the buyer to renew the contract.

A violation of the HCSA "is an unlawful practice and a violation of [the CFA]." N.J.S.A. 56:8-46. "To prevail under the CFA," however, "a plaintiff must not only prove 'unlawful conduct by defendant,' but must also demonstrate 'an ascertainable loss by plaintiff' and 'a causal relationship between the unlawful conduct and the ascertainable loss.'" Dugan, 231 N.J. at 52 (quoting D'Agostino v. Maldonado, 216 N.J. 168, 184 (2013)).

As previously noted, plaintiffs allege the Membership Agreements violate the HCSA, and thus the CFA, in five ways. They contend the agreements do not set forth in a conspicuous manner on the first page the member's total payment obligation as required by subsection b. They point out that the agreements do not state that security has been posted as required by subsection c. They assert the agreements' renewal program and onerous cancellation requirements

obligate members for more than three years, in violation of subsection d, and obligate members to renew their contracts, in violation of subsection i. Last, they allege the memberships state they are non-cancelable. None of these claims withstands rigorous analysis.

Contrary to plaintiffs' assertions, the Membership Agreements displayed all fees to be paid by the member. Apparently plaintiffs contend that in addition to being clearly displayed on the first page of the health club services contract, all fees must be added and the resulting sum must be accurate. Even if such were the legislative intent, neither plaintiffs' pleadings nor discovery demonstrated that any plaintiff suffered an ascertainable loss as a result of their payment obligations, which were conspicuously displayed on the first page of the health club services contracts.

Similarly, though plaintiffs correctly note that the health club services contracts do not set forth that the Club had posted a bond, irrevocable letter of credit or security, none of the plaintiffs have established they suffered an ascertainable loss as a result of such omission.

That is not to suggest we condone the Clubs' regulatory violations. But such violations, while possibly subjecting the Clubs to regulatory sanctions, do

not satisfy the elements of HCSA or CFA actions. Absent a cognizable claim, plaintiffs cannot satisfy the criteria for class certification.

Plaintiffs next allege the health club services contracts obligated members for more than three years, in violation of subsection d, and required members to renew their contracts, in violation of subsection i. These arguments require little discussion. No contract obligated any member for more than three years. No member was required to enroll in the automatic renewal program, and members that elected to do so could cancel the contracts by complying with their cancellation notice provisions. Plaintiffs cannot state a claim, let alone satisfy the class action requirements, by superimposing their own interpretations upon clear statutory or contractual terms.

Similarly, nothing in the Membership Agreements requires any member to renew a contract. As noted, the automatic renewal program is optional and could be canceled at any time.

Nor can plaintiffs create HCSA and CFA claims by taking a phrase out of context — as they have done with the phrase "absolutely non-cancelable" in the Non-cancellation Clause. The phrase "absolutely non-cancelable" is prefaced with the phrase, "except as herein provided." Plaintiff's argument is without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

In the absence of any cognizable HCSA claims, the complaint's TCCWNA claims based on violations of the HCSA cannot meet the criteria for class certification. For the same reasons we have concluded the Membership Agreements do not violate the provisions of the HCSA, we conclude plaintiff's CFA violations based on either the HCSA or the identical provisions of the HCSA do not state cognizable claims and thus cannot meet the criteria for class certification. That leaves the independent CFA claim.

D.

The complaint's first count, in paragraph 188g, alleges the Membership Agreements violate the CFA by "using an unconscionable commercial practice in [d]efendants' cancellation policies and/or billing practices because they impose unreasonable conditions for the sole purpose of discouraging and impeding 'cancellations' of the perpetual, automatically renewing monthly memberships, and thereby cause buyers to pay for unwanted services." In addition, in the complaint's third count pertaining to plaintiff Richter and those similarly situated, plaintiff Richter alleges defendants committed an unconscionable commercial practice in direct violation of the CFA by charging plaintiff Richter and those similarly situated "monthly membership fees and/or annual rate guarantee fees after receiving a cancellation request." We find these

31

CFA claims — asserting that the Membership Agreements' onerous cancellation provisions result in additional charges after a member attempts to cancel — meet the criteria for class certification.[1]

The CFA provides that

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, [or] fraud, . . . in connection with the sale or advertisement of any merchandise . . . , whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]
>
> [N.J.S.A. 56:8-2.]

Merchandise includes "any . . . services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). Thus, to prevail on a CFA claim, a plaintiff must establish three elements: "1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." D'Agostino, 216 N.J. at 184.

---

[1] The term "and/or" has been criticized as a term that "has never been accredited in this state as good pleading or proper to form part of a judgment record . . . ." Fisher v. Healy's Special Tours Inc., 121 N.J.L. 198, 199 (E. & A.1938). The term has since come under more exacting criticism. See State v. Gonzalez, 444 N.J. Super. 62, 71-72 (App. Div. 2016). The ambiguity does not affect our class certification analysis. Plaintiffs' proofs at trial must necessarily include a causal relationship between defendants' unlawful conduct and plaintiffs' ascertainable loss.

A defendant's unlawful conduct can take the form of "affirmative acts, knowing omissions, and regulation violations." Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994). If an affirmative act, "intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act." Id. at 17-18. If an omission, "the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud." Id. at 18. If a violation of a CFA regulation, "intent is not an element of the unlawful practice, and the regulations impose strict liability for violations." Ibid. (citing Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 376 (1977)).

The CFA does not define "unconscionable commercial practice" in its definitional section, N.J.S.A. 56:8-1. "[It] does not attempt to enumerate every prohibited practice, for to do so would 'severely retard[] its broad remedial power to root out fraud in its myriad, nefarious manifestations." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011) (alteration in original) (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 265 (1997)). The Supreme Court has explained that "unconscionability is 'an amorphous concept obviously designed to establish a broad business ethic.'" Cox, 138 N.J. at 18 (quoting Kugler v. Romain, 58 N.J. 522, 543 (1971). "The standard of conduct

that the term 'unconscionable' implies is lack of 'good faith, honesty in fact and observance of fair dealing.'" Ibid. (quoting Kugler, 58 N.J. at 544).

In the case before us, certification as a class of Subclass #2 – "members of the Class who cancelled or attempted to cancel their Membership Agreement, and who were charged additional monthly payments and/or an annual rate guarantee fee after the cancellation date" – withstands rigorous analysis. The Clubs' cancellation policies take advantage of the likelihood that a significant number of consumers will overlook or forget about the advance notice provisions nine, ten, or eleven months after signing the Membership Agreements. Moreover, the cancellation terms prevent members from cancelling their memberships by email or in person at the Club they joined. In that regard, we note the HCSA requires Membership Agreements to include provisions that the agreements may be cancelled – by "registered or certified mail, return receipt requested, or personally delivered, to the address of the health club specified in the contract" – upon a member's death or disability, or upon a member's change of permanent residence to a location more than twenty-five miles from the health club or an affiliated club. N.J.S.A. 56:8-42 (f) & (g) (emphasis added).

The unreasonableness of restricting cancellation in such a way — especially prohibiting in-person cancellation — is easily illustrated by hypothesizing a similar requirement for members when they first appear at a club to join. Would the concept of fairness encompass a procedure that required prospective members to pick up an application at a club, leave, prepare a transmittal letter, and return the application by registered or certified mail, rather than simply signing the application at the club? The concept, though absurd, illustrates the point.

The point, of course, is that Membership Agreements that impose unduly restrictive cancellation requirements can readily be viewed as frustrating cancellation, thus evidencing the absence of good faith, honesty in fact, and observance of fair dealing; or, in CFA terms, an unconscionable commercial practice intended to extract extra dues from consumers.

Subclass #2 satisfies the criteria for class certification. Discovery has demonstrated the class is sufficiently numerous so that joinder is not a satisfactory alternative. The questions of fact and law presented by the class claims are common if not identical. Richter's claims are typical of, if not identical to, the claims of the class. And notwithstanding defendants' personal

attacks on some plaintiffs, Richter and his experienced class action attorneys will undoubtedly, fairly and adequately, protect the interests of the class.

For the reasons we have expressed, our qualitative assessment of the common and individual questions leads us to conclude both that the proposed class is sufficiently cohesive to warrant adjudication by representation and the class action is superior to other available methods for the fair adjudication of this controversy. The cancellation terms in the Membership Agreements, as well as the imposition of post-cancellation fees, present predominant questions of law and fact common to all class members.

Defendants argue, among other things, that Richter suffered no ascertainable loss because he used the club during the post-cancellation period for which he was charged additional fees. But Richter was obligated to pay additional fees he did not want to pay, and extend his membership for a period for which he did not want to extend it. These considerations establish an ascertainable loss. That he mitigated his damages by using the club did not negate an element of a CFA action.

## V.

Although intervening precedent has affected the trial court's certification of the general class and Subclass #1, which are no longer viable, such precedent

36

has not affected the certification of Subclass #2. The trial court did not abuse its discretion in certifying Subclass #2 – "All members of the Class who cancelled or attempted to cancel their Membership Agreement, and who were charged additional monthly payments and/or an annual rate guarantee fee after the cancellation date."

We have considered the parties' remaining arguments and found them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2836-16T1